# United States Tax Court

T.C. Memo. 2025-112

PAUL-ADAMS QUARRY TRUST, LLC, FRANCIS L. ADAMS, TAX
MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 10145-21.                    Filed November 3, 2025.

————

P is the tax matters partner of LLC. In 2007, P and Q purchased a 207.32-acre property in Elbert County, Georgia, for $429,875 (about $2,073 per acre). Starting in late 2010, P and Q quarried granite on the property. They experienced significant losses and abandoned the effort in 2012. Eventually P and Q contributed the property to LLC.

In December 2017, LLC granted a conservation easement (constituting a "qualified real property interest" under I.R.C. § 170(h)(1)(A)) on the property to C, a "qualified organization" under I.R.C. § 170(h)(1)(B). LLC claimed on its tax return a charitable contribution deduction of $10,234,108 (about $49,364 per acre) for a "qualified conservation contribution" under I.R.C. § 170(h). It attached to the return an appraisal supporting the deduction and taking the view that the highest and best use of the property was granite mining.

R examined LLC's 2017 return and issued a Notice of Final Partnership Administrative Adjustment denying the claimed charitable contribution deduction. R also determined an accuracy-related penalty under I.R.C. § 6662.

**[*2]**   P challenges R's adjustments. P maintains that the burden of proof should be on R. P contends the appraisal attached to LLC's 2017 return was a qualified appraisal and correctly determined the property's highest and best use as an active granite mine. P argues the value of the conservation easement is much greater than that proposed by R. P claims that no penalties should apply and, if a gross valuation misstatement penalty is found applicable, the penalty is unconstitutionally void for vagueness.

R disagrees with P's views in all respects and maintains that, if any deduction is allowed, it should be limited to $612,000 (about $2,952 per acre), the value of the easement as proposed by R's expert.

*Held:* P has the burden of proof.

*Held, further*, the appraisal attached to LLC's 2017 return was a qualified appraisal prepared by a qualified appraiser within the meaning of I.R.C. § 170(f)(11) and the relevant regulations.

*Held, further*, the highest and best use of the property was not as an active granite mine.

*Held, further*, the value of the easement LLC granted to C in 2017 was $612,000, as R maintains.

*Held, further*, the gross valuation misstatement penalty under I.R.C. § 6662(a) and (h) applies.

*Held, further*, I.R.C. § 6662(h) and related regulations are not void for vagueness.

————————

*Charles E. Hodges II, Simon P. Hansen, Anthony J. DeRiso III*, and *Megan Kirk Garrett*, for petitioner.

*Dillon T. Haskell, Ryan J. Lonergan, Spencer A. Martin, David Y. Kamins*, and *Nina P. Ching*, for respondent.

3

[*3] TABLE OF CONTENTS

FINDINGS OF FACT ............................................................................ 9

I.  Elberton and Elbert County, Georgia............................................. 10

II.  Granite Dimension Stone................................................................ 11

III.  Assessing Mineral Deposits ........................................................... 12

IV.  Mr. Adams and Mr. Paul................................................................. 14

    A.  Mr. Adams ................................................................................ 14

    B.  Mr. Paul .................................................................................... 16

V.  The Paul-Adams Property and Property History........................... 16

VI.  The Sterling Gray Quarry................................................................ 18

    A.  History of Sterling Gray Quarry ............................................. 19

    B.  Mr. Adams's Purchase of the Sterling Gray Quarry ............. 20

    C.  Characteristics and Performance of the Sterling Gray Quarry ........................................................................................ 21

VII.  Vacant Land Sales in Elbert County ............................................. 22

VIII.  Origins of the Easement Transaction............................................ 23

IX.  Formation of Paul-Adams and Granting of Easement .................. 24

X.  Facilitating Work and Appraisal .................................................... 25

    A.  Drilling Report ......................................................................... 25

    B.  Geology Report ......................................................................... 26

    C.  Appraisal Report ...................................................................... 26

XI.  Tax Returns and IRS Examination ................................................ 27

XII.  Trial ................................................................................................ 28

    A.  Petitioner's Experts.................................................................. 28

**[*4]**     1.    Dr. Schroeder ................................................................ 28

           2.    Nick Proctor ................................................................. 29

           3.    Mr. Fletcher ................................................................. 30

           4.    Benjamin Black ........................................................... 31

    B.    The Commissioner's Expert, Andy Sheppard ........................ 32

    C.    Rebuttal Experts ................................................................. 32

OPINION ............................................................................................. 33

I.    Burden of Proof ............................................................................ 33

II.    Substantiation of the Charitable Contribution Deduction ........... 35

III.    Amount of the Deduction ............................................................. 38

    A.    General Principles ................................................................ 38

    B.    Highest and Best Use ........................................................... 40

           1.    Legal Principles ............................................................. 40

           2.    Highest and Best Use of the Property Before the Easement Was Granted ................................................. 43

                a.    Actual Use in December 2017 ................................ 43

                b.    Reasonably Probable Future Use ........................... 44

                c.    Petitioner's Proposed Highest and Best Use .......... 44

                     i.    Mr. Adams's and Mr. Paul's Own Actions ....... 45

                     ii.    Implausible Economic Analysis by Petitioner's Experts ......................................... 47

                         a)    Unrealistic Sale Volumes and Market Share Forecasts ......................................... 48

                         b)    Unrealistic Quarry Efficiency ................... 57

                         c)    Unproven Quality of Granite ................... 58

5

**[*5]**

            d)    Unrealistic Projected Prices ...................... 61

            e)    Unrealistic Labor Assumptions................ 63

            f)    Unrealistic Assumptions About Available Granite Deposits........................ 63

      d.    The Commissioner's Proposed Highest and Best Use ...................................................................... 66

      e.    The Court's Conclusion on Highest and Best Use Before the Easement Was Granted......................... 66

   3.    Highest and Best Use of the Property After the Easement Was Granted .................................................. 68

  C.    Valuation of the Paul-Adams Property Before the Easement Was Granted ......................................................... 68

   1.    Legal Principles ................................................. 68

   2.    Comparable Sales Approach .......................... 69

      a.    Proposed Comparable Sales ................................. 70

      b.    Analysis ................................................................. 72

         i.    Sale 1................................................................ 72

         ii.    Sale 2................................................................ 72

         iii.    Sale 3................................................................ 76

         iv.    Sale 4................................................................ 77

         v.    Mr. Sheppard's Conclusion ............................. 78

         vi.    Petitioner's Arguments.................................... 79

            a)    "Market Participants" Argument ............. 79

            b)    Timing of Sales........................................ 82

            c)    Purported Failure to Verify ...................... 86

            d)    Highest and Best Use ............................... 86

**[*6]**        vii. The Court's Conclusion as to "Before" Comparable Property Sales.............................. 88

    3.     Actual Transactions Approach........................................ 88

    4.     Income Approach ............................................................ 90

    5.     Petitioner's Hybrid Method............................................ 98

        a.     The Proposed Royalty Method................................. 98

        b.     The Proposed Comparable Sales Method.............. 100

  D.     Valuation of the Paul-Adams Property After the Easement Was Granted ...................................................... 102

  E.     Valuation Conclusion......................................................... 102

IV.  Penalties ...................................................................................... 103

  A.     General Principles and Application ................................... 103

  B.     Constitutional Challenge.................................................... 104

## MEMORANDUM FINDINGS OF FACT AND OPINION

TORO, *Judge*: This case concerns the contribution of a conservation easement by Paul-Adams Quarry Trust, LLC (Paul-Adams), in 2017. Petitioner is Francis L. (Rusty) Adams, Paul-Adams's tax matters partner.[1]

Petitioner's heightened rhetoric aside, this is not a difficult case. The principal question before the Court is the value of the easement Paul-Adams granted to the Oconee River Land Trust (Oconee Trust) in December 2017 over approximately 207 acres in Elberton, Georgia (Paul-Adams property). The easement restricted what Paul-Adams

---

[1] Throughout the Opinion, we refer to Mr. Adams both as petitioner and as Mr. Adams. We generally refer to "petitioner" when Mr. Adams's position as the tax matters partner of Paul-Adams is of particular import to the discussion or when we wish to address arguments made by counsel on his behalf. We generally refer to "Mr. Adams" when the principal focus of the discussion is on either Mr. Adams's actions outside of these proceedings or his testimony in this case.

[*7] could do in the future with those 207 acres. Paul-Adams claimed in its return that the restriction reduced the value of the Paul-Adams property by $10,234,108. This claim has no basis in reality, and we therefore reject it.

An original partner in Paul-Adams, Robert Elliot Paul, Sr., first purchased the Paul-Adams property in 1997 for $199,000 and then sold it in 2000 for $327,000. In 2007, Mr. Paul, together with Mr. Adams, repurchased the Paul-Adams property for $429,875. They proceeded to quarry granite dimension stone on the property starting in 2010 and continuing for two more years at a loss. They then closed the quarry in 2012, even though Mr. Adams was at the time actively searching for a granite quarry to meet his granite fabrication business's needs.

In 2014, Mr. Adams leased another inactive quarry in the same area to supply his granite fabrication business. The lease covered about 159 acres and required modest lease payments. Under the terms of the arrangement, Mr. Adams had an option to acquire the 159 acres by 2019 for $1.4 million (net of any payments made under the lease).

Yet, when the easement was granted over the Paul-Adams property in 2017, Paul-Adams claimed the property was worth $10,545,088, relying on its supposed value as an operating granite quarry. In petitioner's view, the dormant Paul-Adams property could, within four years of being revived, produce a material percentage of the total granite dimension stone produced annually in the entire State of Georgia.

Petitioner has provided no credible evidence of how this would be achieved or why, if these claims were true, the property had not already been used for this purpose. The claimed value of the parcel in 2017 represented a more than 2,400% increase over its prior sale price in 2007. And its purported value was more than 750% of the value of the property Mr. Adams was leasing at the time, which included a larger quarry with a much better track record, and with respect to which he had an option to buy.

In view of the entire record in this case, we find petitioner's claim utterly unsupportable. In brief, the history of the parcel at issue, the state of the relevant industry in 2017, market transactions in the area (some of which involved Mr. Adams himself), and credible expert testimony all tell us that the value of the conservation easement was nowhere near the amount claimed. Paul-Adams's return position was

**[\*8]** based on a misreading of one expert's report and a thoroughly unreliable second expert report. The actions of Paul-Adams's own partners belied the position, as did the history of quarrying activities on the land on which the restriction was placed and Mr. Adams's leasing of a superior property instead of quarrying the Paul-Adams property.

When resolving questions of value with respect to natural resources, the law requires courts to take into account only things that are reasonably probable. This is so because, as the Supreme Court put it long ago, "[e]lements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration." *Olson v. United States*, 292 U.S. 246, 257 (1934). To do otherwise "would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth." *Id.*

On the record here, we have no doubt that, contrary to petitioner's assertions, as of December 2017, extraction of the natural resource at issue as granite dimension stone was not economically feasible in the near future. Therefore, the highest and best use of the property as of that time was not an active operating quarry. And, in any event, the value of what Paul-Adams gave up by contributing the easement was nowhere close to what was reflected in its tax return or what petitioner maintains.

After concessions by the parties, the remaining issues for decision are as follows:

(1)     Which party has the burden of proof;

(2)     Whether the appraisal attached to Paul-Adams's Form 1065, U.S. Return of Partnership Income, for 2017 was a qualified appraisal prepared by a qualified appraiser under section 170(f)(11)[2] and Treasury Regulation § 1.170A-13(c);

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are shown in U.S. dollars and generally are rounded to the nearest dollar.

**[*9]**   (3)   The value of the easement Paul-Adams donated;

(4)   Whether any accuracy-related penalty applies under section 6662; and

(5)   If the gross valuation misstatement penalty under section 6662(a) and (h) applies, whether section 6662(h) and related regulations are void for vagueness.

For the reasons below, we find that the burden of proof is on petitioner and that the appraisal attached to Paul-Adams's 2017 return was a qualified appraisal prepared by a qualified appraiser. We further find that the value of the easement was $612,000, the amount proposed by the Commissioner's expert, and that, as a result, the gross valuation misstatement penalty applies. Finally, we conclude that section 6662(h) and related regulations are not void for vagueness.[3]

### FINDINGS OF FACT

The following facts are derived from the pleadings, Stipulations of Fact with attached Exhibits, as supplemented, and the testimony of fact and expert witnesses admitted into evidence at trial. Paul-Adams is a Georgia limited liability company that was classified as a partnership under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, for its taxable year ending December 31, 2017.[4] When the Petition was timely filed, Paul-Adams maintained its principal place of business in Georgia, and petitioner resided in Georgia.

Several of the fact witnesses petitioner called were themselves participants in the transaction at issue, with significant money at stake, or else acquaintances or business associates of those individuals. Some witnesses had invested in or advised on similar conservation easement deals and thus had a direct or indirect stake in the outcome of this case. While generally showing good recall of many facts from the relevant

---

[3] As we said at the start, this is not a difficult case. The length of the Opinion should not obscure this fact. The Opinion is long and addresses in detail many of the arguments pressed by petitioner in part because parties in several other cases have agreed to be bound by the outcome of this case and the Court believes the parties here and in those cases should know that their arguments were considered carefully and why their positions did not prevail.

[4] Before its repeal, TEFRA governed the tax treatment and audit procedures for many partnerships, including Paul-Adams.

[*10] period, they sometimes expressed inability to recall certain facts about matters that might be regarded as unhelpful to petitioner's position. Their testimony also sometimes conflicted with the testimony of others, their own prior or subsequent testimony, and documents in the record. Because of this inconsistent testimony and some of the witnesses' selective inability to recall pertinent facts, the Court has been required to make credibility determinations.

I.    *Elberton and Elbert County, Georgia*

The Paul-Adams property is near the city of Elberton, in Elbert County, Georgia. Elbert County borders Oglethorpe County and Madison County, both in Georgia. Elberton is the largest city within Elbert County and serves as the county seat.

Of particular relevance here, Elberton advertises itself as the "Granite Capital of the World." That is because Elberton is located on the Elberton granite deposit, which is over 35 miles long, 6 miles wide, and 2 to 3 miles deep, and produces a lot of granite.

Elbert, Oglethorpe, and Madison counties all contain portions of the Elberton granite deposit.[5] Because of the deposit, numerous granite quarries and granite fabrication plants are based in the area. Indeed, many properties in Elbert County contain visible granite deposits, including properties used for farming and residences. But the quality of granite varies at different locations across the Elberton granite deposit, and the deposit does not cover all of Elbert County.

The type of granite produced from the Elberton granite deposit is sometimes referred to as "Georgia Gray" granite. Georgia Gray granite is found throughout the three counties and is known for being homogenous with a relatively fine grain size. It is gray colored and medium-fine grained, which makes it distinct from other granites. Georgia Gray is especially suitable for fabricating memorials because of its color, hardness, and uniformity, and has been certified by the U.S. Bureau of Mines as a Class One Monumental Stone.

Elberton opened its first commercial granite quarry 136 years ago (in 1889). But quarrying is a risky business. Even on the Elberton granite deposit, success is by no means guaranteed. Some quarries fail, even those with long histories of successful operations. As a result, there

---

[5] Granite-producing areas within these counties are collectively known as the Elberton granite area.

**[*11]** are a number of abandoned quarries in Elbert County and surrounding counties.

Granite that has been fabricated into finished products—including, but not limited to, headstones, monuments, and curbing slabs—can be shipped from Elberton throughout the United States.[6] Because of the Georgia Gray granite, many fabrication plants in the Elberton area focus on the memorial industry.

II.     *Granite Dimension Stone*

In the U.S. granite industry, miners quarry both aggregate and dimension stone. The aggregate industry encompasses the use of hard rock materials for a variety of products that are primarily used in construction. Crushed stone and sand and gravel make up most aggregate production and are primarily used for asphalt and concrete pavement.

Granite dimension stone (i.e., a solid block of larger size) is used for, among other things, building stone blocks; landscaping and curbing; cobblestone; flooring and countertops; and monuments, mausoleums, and statues. For these purposes, dimension stone must be not only durable, but also visually aesthetic and consistent in color and grainsize. In 2017, Georgia was the top producer of granite dimension stone in the United States, producing nearly 25% of all granite dimension stone. In Georgia, surface mine permits are not required for a dimension stone quarry.

There are different grades of granite dimension stone, from higher to lower quality and price. The highest grade is mausoleum stone, and the second highest is die stock. These grades are essentially the same quality, but because mausoleum stone must be pulled out in larger blocks, it has a higher price. Next is base stock, followed by quarry run, coping, and curbing. Quarry run is a combination of base and die stock and is priced similarly to base stock.

In the years leading up to 2017, the market for granite dimension stone in Elberton was relatively flat. This situation did not materially change until 2021, when end-users from the northeastern United States

---

[6] At various times, the parties and various witnesses used the terms "fabrication," "finishing," and "manufacturing" to describe the process of converting raw granite into finished products. To avoid confusion, we will consistently use the terms "fabrication" and "fabrication plant" here.

[*12] determined that it was less expensive to quarry granite curbing stone in Georgia and ship it to the northeast than to quarry the stone locally.[7]  Curbing stone is in high demand in the northeast because granite, unlike concrete, does not degrade when exposed to extreme weather and salted streets.  These new market entrants caused an increase in demand for Elberton granite, particularly curbing stone, as well as higher prices.

III.    *Assessing Mineral Deposits*

The presence or absence of mineral deposits on real property, as well as the location, quantity, and quality of those deposits, can affect the fair market value of the property.  The level of certainty with respect to such characteristics is also important. For example, all else being equal, a parcel with large, high-quality mineral deposits that have been confirmed will be more valuable than a parcel where such deposits are merely suspected.

The Society for Mining, Metallurgy, and Exploration, Inc. (SME), has formalized these and other principles in a guide that recommends reporting standards for mineral resources and reserves.  The guide is known as the SME Guide for Reporting Exploration Information, Mineral Resources, and Mineral Reserves (SME Guide).  In 2017, the applicable standard for engineering studies of mining operations in the United States, the Securities and Exchange Commission Industry Guide 7, was based on the SME Guide for 2017.

The SME Guide for 2017 sets out two categories of mineral estimating, mineral resources and mineral reserves.  Mineral resources reflect simply the content below ground, while mineral reserves reflect the below-ground mineral content that can be used, considering economic, legal, environmental, and other factors.

Within those macro-categories, increasing levels of geological confidence separate categories along another dimension.  Mineral resources can be inferred, indicated, or measured—increasing in confidence, respectively.  Mineral reserves can be probable or proven. And, before one even enters the world of mineral resources and reserves,

---

[7] Around this time, Williams Stone Company, a major end-user of granite, began operating in Elberton and ultimately purchased dimension stone quarries there, facilitating the sale of granite curbing stone from Elberton to the northeast.  One such quarry was a 126.81-acre property with existing pits, which Williams Stone purchased in December 2021 for $2 million.

**[\*13]** the "exploration results" category describes the least certain category.

The SME Guide for 2017 includes a chart explaining these concepts, reflected below.



Individuals considering the prospect of mining a given property use different types of studies to move between the categories: scoping, prefeasibility, and feasibility. A scoping study (also known as preliminary economic assessment) is used to determine whether a prefeasibility study is warranted. It determines whether there are reasonable prospects for eventual economic extraction of a mineral resource, but does not demonstrate that economic extraction is viable. Prefeasibility studies permit the conversion of a mineral resource into a mineral reserve by demonstrating economic viability. Feasibility studies do the same, but provide a higher level of rigor, increasing the confidence in the resulting mineral reserve.

We will return to these concepts, which public companies apply in their decision-making, when we consider the value of the granite deposit on the Paul-Adams property. For now, having offered some general background on Elbert County and the related granite industry, we turn to the individuals, property, and transactions before us.

**[\*14]** IV.   *Mr. Adams and Mr. Paul*

The transactions relevant to this case generally were undertaken by Mr. Adams and his business partner, Mr. Paul. Both Mr. Adams and Mr. Paul are seasoned businessmen with, collectively, more than ten decades of experience in the granite industry. Over the years, Mr. Adams and Mr. Paul have partnered for certain business ventures.

A.   *Mr. Adams*

Mr. Adams, whose history is particularly relevant here, has worked in the granite industry since the late 1960s, when he started with a large granite memorial fabricator as a salesman. In 1972, Mr. Adams moved to Star Granite, a smaller memorial fabricator. Soon after, Mr. Adams bought Star Granite with a group of four partners. The business prospered, and over the years Mr. Adams bought out his partners. By 1990, Mr. Adams owned Star Granite outright.

As Star Granite grew, Mr. Adams and his partners purchased the Pink Pearl Quarry in 1980. The Pink Pearl Quarry is a drive-in quarry that produces a kind of granite that is sold to memorial garden cemeteries. Typically, this granite is shaped into a four-inch foundation piece that is affixed with a bronze marker on top, leaving only two inches of granite visible around the bronze. Almost all the granite mined from the Pink Pearl Quarry is usable, because less uniformity is required for these products than for larger products where more granite is visible.

For the other types of granite required by its business, which produces many kinds of granite memorial stones, among other things, Star Granite purchased gray granite from other quarries in Elberton and imported colored granite of different types from suppliers outside Elberton, including international suppliers.

Around 2011, the demands on Star Granite increased. Three of Star Granite's major customers combined in a single multinational company, which pushed Star Granite to produce more and more varied products. Mr. Adams knew he would need to buy and operate a gray granite quarry to supply Star Granite's needs at some point. As early as 2011, he was looking for the right quarry to purchase, but he never found exactly what he needed in terms of the amount of production required to run Star Granite's plants.

In late 2013, Mr. Adams and his son, Mark Adams, were contacted by John McLanahan, Jr. (John Jr.), a successful lawyer and

[*15] banker whose father, John McLanahan Sr. (John Sr.), had recently died. John Jr. told Mr. Adams that the McLanahan family intended to sell their granite quarry, the Sterling Gray Quarry,[8] and asked if Mr. Adams and his son would be interested. Mr. Adams was interested and agreed to lease the quarry starting in 2014 with an option to buy.[9] We consider the Sterling Gray Quarry and this transaction in greater detail below.[10] *See infra* Findings of Fact Part VI.

By 2015 and 2016, Mr. Adams was seriously considering selling Star Granite. The eventual buyer, Matthews International Corporation (Matthews), was not interested in acquiring Mr. Adams's quarries, so negotiations proceeded for Star Granite's fabrication businesses alone. On February 1, 2018, Mr. Adams sold the relevant divisions of Star Granite for about $41.2 million. For the year ended December 31, 2017, those divisions had revenues of about $31.3 million and employed approximately 200 people. Mr. Adams kept his rights to the Sterling Gray Quarry and the Pink Pearl Quarry, executing a supply agreement with Matthews under which Sterling Gray and Pink Pearl would continue to supply the granite needs of the divisions of Star Granite sold to Matthews for at least ten years.

Under that supply agreement, Mr. Adams's company agreed "to produce and make available for sale to Matthews" at least 80,000 cubic feet of granite from the Sterling Gray Quarry annually at specified prices. The agreement referred to this amount together with a specified amount of granite produced by the Pink Pearl Quarry as the "Minimum Amounts."

Matthews was obligated to purchase the Minimum Amounts from Mr. Adams's company, with two exceptions. Specifically, Matthews was

---

[8] Different names appear in the record for the Sterling Gray Quarry, for example, the McLanahan Quarry, the Republic Granite Quarry, and the Highpoint Quarry Property. For convenience, we use Sterling Gray Quarry, the name Mr. Adams uses.

[9] As we will discuss, Mr. Adams ultimately exercised the option and purchased the Sterling Gray Quarry in 2019.

[10] We note that the lease agreement concerning the Sterling Gray Quarry was made between Star Granite Company, Inc., an entity owned by Mr. Adams, and Republic Granite Company, Inc., an entity of which Mr. McLanahan was the president. Ex. 66-J, p. 1. The option to purchase the Sterling Gray Quarry was exercised by Sterling Gray Quarries, LLC, another entity Mr. Adams owned. For convenience, and in line with the testimony at trial, we refer to the lease, and the eventual purchase, as occurring between Mr. Adams and Mr. McLanahan.

[*16] free to buy fewer than 80,000 cubic feet if it could establish either (1) that its annual granite needs had decreased as a result of a lack of demand generated by consumer orders or (2) that Matthews's annual purchase orders remained at or above the granite supply needs of the business Matthews acquired from Mr. Adams in February 2018. Matthews also had the right (but not the obligation) to buy an additional 10,000 cubic feet of blue granite at a discount from standard prices. And prices for the Minimum Amounts could not increase by more than 2% per year during the term of the agreement.

B.     *Mr. Paul*

Mr. Paul began working in the granite industry in 1962 and first became an owner of a fabrication plant in 1980. Over the years, Mr. Paul was quite successful and owned both granite fabrication plants and granite quarries. He has purchased five or six granite quarries and sold three or four.

In 2012, Mr. Paul gifted the granite fabrication arm of his business, which was called Eagle Granite Company, to members of his family, keeping his quarries for himself. In 2017, Mr. Paul's family had one of the three largest granite fabrication operations in Elberton. In 2023, Mr. Paul's family sold Eagle Granite to Matthews, and again Mr. Paul retained his quarries. The initial price for the business was $18.1 million, although the deal included an earn-out provision with a potential bonus of about $5 million.

Three of the quarries Mr. Paul owned during this time were the Green County Quarry, the Blue Ridge Quarry, and the Danburg 2 Quarry, which together sat on a little over 200 acres. In 2024, Mr. Paul leased the quarries to Polycor Georgia Granite Quarries, Inc. (Polycor), a subsidiary of an international mining company. He leased them on a royalty basis, with a 10% royalty on gross sales and a minimum royalty payment of $50,000 per month. Mr. Paul based the minimum royalty on his sales for the year before he entered the lease, which were about $6 million, and divided that number by 12.

V.     *The Paul-Adams Property and Property History*

As we have noted, the Paul-Adams property is in Elbert County, between Elberton and Bowman, Georgia. The property is 207.32 acres and about five miles from Elberton.

[*17] The Paul-Adams property is long and somewhat irregularly shaped, with frontage along the south side of Bowman Highway and the north side of Nowhere Road. It has areas of open fields, pine stands, and at least one pond. The property also contains two small residences, one built in 1955 and one in 1960, as well as a prefab shed.

Granite outcroppings are visible on the property, particularly on the north end, with schist outcroppings visible on the southern end.[11] In the 1980s, a small granite quarrying operation was attempted on the northern side of the property, resulting in a small pit. And as we will discuss, granite quarrying was again attempted on the property from 2010 to 2012, resulting in a larger pit that existed at the time the easement was granted.

Mr. Paul first purchased the Paul-Adams property in 1997, paying $199,000 for a slightly larger tract that included the property. Mr. Paul then sold the 207.32-acre Paul-Adams property to Donnie Williams and Walter H. McGee in 2000 for $327,000. Mr. Williams and Mr. McGee were business owners in Lavonia, Georgia, approximately 27 miles from the Paul-Adams property. At the time of the sale, Mr. Paul was aware of the granite outcroppings and small pit on the Paul-Adams property.

Seven years later, Mr. Paul and Mr. Adams purchased the Paul-Adams property back from Mr. Williams and Mr. McGee. Specifically, in January 2007, Mr. Paul and an entity owned by Mr. Adams (FLA Enterprises, LLC) purchased the property for $429,875.

Mr. Paul and Mr. Adams repurchased the Paul-Adams property because they were interested in mining granite on the property. They began operating a pit quarry on the property in 2010, allowing Mr. Adams's son Mark to run the operation.[12] They used the original quarry site for their operation and expanded the quarry's footprint over

---

[11] Schist is a medium- to coarse-grained metamorphic rock that is prone to flaking and generally is not usable in the Elberton granite industry.

[12] Pit quarries are excavation sites where granite is mined by digging downward. Typically, larger crews and tower cranes are required to extract granite blocks from a pit quarry. Because of the vertical nature of the excavation, pit quarries are labor intensive and generally have lower production rates with higher operating costs. By contrast, drive-in quarries, which are developed by cutting laterally into hillsides, allow for a more efficient extraction process. For example, wheeled loaders, rather than cranes, can be used to move blocks out of the quarry. But drive-in quarries involve higher up-front costs to establish.

[*18] a wider area. They brought in crews from Mr. Adams's and Mr. Paul's other quarries every week as contract labor. But, even though Mr. Adams was at the time searching for a quarry to supply his fabrication plants, they abandoned the quarry and sold associated equipment at the end of 2012.

Some of the stone found at the Paul-Adams property was Georgia Gray granite. But the quality of the granite varied. For example, significant amounts of discarded granite from the quarry were dumped around the pit and in a large refuse pile on the southern portion of the property. The waste blocks contained imperfections that made them unsuitable for sale as dimension stone, including veins, discolored granite, and irregular dimensions. The waste pile also contained blocks that were part granite and part gneiss, another kind of stone that Elberton dimension stone miners typically discard.

The entity that operated the quarry reported business losses for the years that it operated the quarry. Specifically, on its 2010, 2011, and 2012 Forms 1120, U.S. Corporation Income Tax Return, the entity reported ordinary business losses of $44, $175,532, and $189,752, respectively. Although no mining was conducted in 2013, the entity also filed a final Form 1120 in 2013, on which it reported gross receipts of $6,534 and net ordinary business income of $3,013.

At the time the easement was granted in 2017, the quarry pit on the Paul-Adams property was full of water. The Paul-Adams property was zoned industrial and could have been used (without rezoning or a special land use permit) as a dimension stone quarry. It could not have been operated as an aggregate mine, however, without additional permitting.

The Paul-Adams property had typical public utilities for the area and was across the highway from a railroad spur. And it had an ample amount of land area, ample width and depth, ample road frontage, no prohibitive level of rock outcroppings, and no other hindrances to development for granite dimension stone quarrying.

VI.    *The Sterling Gray Quarry*

Less than two years after Mr. Paul and Mr. Adams abandoned the quarry operation on the Paul-Adams property, Mr. Adams entered into a five-year lease for a different quarry in Elbert County—the Sterling Gray Quarry. Before proceeding with our discussion of the Paul-Adams easement transaction, we pause to discuss the Sterling

**[\*19]** Gray Quarry, including its history, Mr. Adams's lease, and his purchase of the quarry in 2019.  Comparing characteristics of the Sterling Gray Quarry to those of the Paul-Adams property, as well as Mr. Adams's actions with respect to the two parcels, will be significant in our analysis.

### A.     *History of Sterling Gray Quarry*

The Sterling Gray Quarry is a pit quarry in Elbert County on 159 acres of land.  The quarry was started in the 1930s by John Jr.'s great-grandfather, to whom Mr. Adams referred as "Mr. John."  Mr. John had three sons, Clarence, Jules, and James.  Clarence was the father of John Sr. and the grandfather of John Jr.

Mr. John was a successful entrepreneur and, in addition to running the Sterling Gray Quarry, ran fabrication plants that were used to turn the quarried granite into finished products.  The fabrication plants purchased all their granite from the Sterling Gray Quarry, so the quarry prospered.

Mr. John successfully managed the Sterling Gray Quarry until he passed away around 1970.  After Mr. John's death, Jules (John Jr.'s great-uncle) took over operating the quarry and fabrication business.

Jules ultimately was less successful than his father.  The fabrication business's fortunes declined, bringing down the fortunes of the Sterling Gray Quarry as well.  The operations continued until the 1990s when the three McLanahan brothers (Jules, Clarence, and James) no longer participated in the business.  Eventually the fabrication operations were largely shut down.  As a result, after six decades of operation, the Sterling Gray Quarry also closed.

But the McLanahans were not finished.  Around 2004, John Sr. and his son John Jr. brought in a crew to reopen the Sterling Gray Quarry.  They made some progress breaking into the commercial construction market by offering granite that could be used in buildings, plazas, and the like.  But the Great Recession hit the construction industry particularly hard, and in 2008 the McLanahans were forced to close the quarry once again. So matters stood until 2014, when John Jr. approached Mr. Adams about the possibility of leasing and buying the Sterling Gray Quarry.

[*20]  B.    *Mr. Adams's Purchase of the Sterling Gray Quarry*

Mr. Adams was a natural buyer for the Sterling Gray Quarry. He had a reputation as a successful businessman in Elberton and ran one of only three companies in town with sufficient demand for granite (through his fabrication plants) to support the purchase.[13] In addition, Mr. Adams's mother had worked for at least 30 years as bookkeeper for the McLanahan family, first for Mr. John and later for Jules.

After approaching Mr. Adams, John Jr. named $1.4 million as the purchase price for the Sterling Gray Quarry. Mr. Adams was interested and agreed to lease the Sterling Gray Quarry with an option to buy. Specifically, the lease was for an initial term of five years, and the option to buy could be exercised during that initial term. Every dollar paid to lease counted against the ultimate purchase price if the option was exercised. The lease could also be renewed up to three times. With respect to gray granite, the lease required a payment of $1 per cubic foot of product sold, except that for curbing stone the rate was only 33 cents per cubic foot.[14] The lease also had a $36,000 per year minimum annual royalty payment.

Mr. Adams and John Jr. entered into the agreement in 2014, and Mr. Adams eventually exercised his option to purchase the Sterling Gray Quarry in February 2019. Mr. Adams paid $1,172,367 for the quarry, equal to the $1.4 million option price less the royalties that he had paid over the previous five years, which amounted to $227,633 (i.e., $1,400,000 − $1,172,367). Ex. 600-R, p. 224. At the same time, he bought from the McLanahans an additional 46-acre parcel adjacent to the Sterling Gray Quarry for $120,000. The combined transactions were reflected in the records of the Elbert County Tax Assessors office as a sale of 205.473 acres for $1,292,367, with the prior years' royalties already netted from the purchase price.

---

[13] Mr. Paul's family company was another one of the three.

[14] In addition to the main quarry with its various grades of gray granite, the 159-acre Sterling Gray property also has an abandoned quarry with pink granite that Mr. Adams has not quarried to date. Prices for colored granite, including pink granite, are significantly higher than prices for gray granite. As a result, the royalty rate for pink granite during the lease term was $3 per cubic foot rather than $1 per cubic foot.

**[*21]** C. *Characteristics and Performance of the Sterling Gray Quarry*

As we have discussed, the Sterling Gray Quarry had existed for over 70 years when Mr. Adams began leasing it, although it had not been quarried for about 6 or 7 years as of that time. The quarry is about 110 feet deep, with exposed walls that reflect past mining activity.

During the lease and since Mr. Adams purchased the quarry, Sterling Gray has met Star Granite's production needs and 90% of the granite it produces has been salable. Further, it has produced high quality granite that commands higher prices. Specifically, to date, the Sterling Gray Quarry has produced primarily die, base, and quarry run stock, including blocks large enough for mausoleum stone. Sterling Gray Quarry's annual production of granite, sales of granite blocks, and net income from 2019 through 2023 are described in the following table:[15]

---

[15] The parties included in their Fourth Stipulation of Facts five years of financial data for the Sterling Gray Quarry, *see* Exhibits 86-P, 87-P, 88-P, 89-P, and 90-P, with the Commissioner reserving objections as to relevance and materiality. Petitioner specifically discussed Exhibit 89-P at trial, and we overruled the Commissioner's objections, admitting the exhibit. The remaining exhibits were not specifically discussed at trial, although petitioner repeatedly referred to the performance of the Sterling Gray Quarry. The Commissioner's objections with respect to the remaining Exhibits are also hereby overruled and they are admitted. *See* Rule 91(c) ("A stipulation that has been filed need not be offered formally to be considered in evidence."); *see also* Rule 91(a)(1) ("Documents or papers or other exhibits annexed to or filed with the stipulation will be considered to be part of the stipulation.").

[*22]

| Sterling Gray Quarry – Summary of Results | | | | |
|---|---|---|---|---|
| Year | Production (cubic feet) | Income from Block Sales[16] | Gross Income | Net Income |
| 2019 | 67,468 | $854,233 | $908,752 | $208,585 |
| 2020 | 77,427 | 1,009,512 | 1,147,453 | 364,394 |
| 2021 | 106,915 | 1,646,456 | 1,725,439 | 489,504 |
| 2022 | 164,112 | 2,908,177 | 2,976,632 | 1,300,561 |
| 2023 | 171,726 | 3,238,107 | 3,321,007 | 1,225,579 |

VII.    *Vacant Land Sales in Elbert County*

As shown in the table below, between 2007 and 2017, there were 108 sales of vacant land of 50 acres or more that the Elbert County Appraiser's Office classified as market transactions.    The average per-acre sale price in 2007 was $2,999.  By 2017, the average price was $2,156. Generally, property zoned for industrial use sold for about twice as much as property zoned for agricultural use.

---

[16] Gross income reflects income from block sales as well as income from other items, such as cleaning sales and shipping and delivery income.

[*23]

| Vacant Land Sales in Elbert County | | |
|---|---|---|
| Year | Number of Sales | Average Sale Price per Acre |
| 2007 | 12 | $2,999 |
| 2008 | 3 | 2,590 |
| 2009 | 2 | 2,225 |
| 2010 | 6 | 2,590 |
| 2011 | 5 | 1,794 |
| 2012 | 9 | 1,974 |
| 2013 | 11 | 1,623 |
| 2014 | 10 | 1,571 |
| 2015 | 16 | 1,792 |
| 2016 | 17 | 1,926 |
| 2017 | 17 | 2,156 |

VIII. *Origins of the Easement Transaction*

Over the years, Mr. Adams engaged in several transactions, including investing in film tax credits, that his certified public accountant (CPA) suggested to offset Mr. Adams's income tax liabilities for profits from his various businesses, including Star Granite. In 2016, also on the recommendation of his CPA, Mr. Adams invested $500,000 in the syndicated conservation easement addressed by our Court in *Jackson Crossroads, LLC v. Commissioner*, T.C. Memo. 2024-111. He claimed a deduction of about $2 million associated with the transaction. That syndicated transaction was organized through Greencone Investments, LLC (Greencone). Mr. Adams never saw the property associated with that transaction.

Mr. Adams also participated with Greencone in a conservation easement transaction known as the Cape Resources transaction. He

**[*24]** invested about $3.8 million in that transaction and claimed a deduction of about $16 million, again never visiting the property. And he had a small interest in a conservation easement transaction known as the Cedar Creek transaction.

After participating in the Jackson Crossroads easement, Mr. Adams approached Greencone to discuss the possibility of doing a private conservation easement transaction with the Paul-Adams property. Because Greencone organized only syndicated conservation easements, Greencone referred Mr. Adams to Mooncrest Consulting, LLC (Mooncrest), although it remained involved in certain aspects of the transaction.

In early 2017, Mr. Adams and Mr. Paul engaged Mooncrest to facilitate the easement transaction with respect to the Paul-Adams property. Mr. Adams provided limited information about the property to Mooncrest, such as a plat map and acreage. But he did not provide any information about the mining that had been performed on the property. Mr. Adams also met with Carlton Walstad, a representative of Greencone who helped facilitate the easement transaction. Mr. Walstad toured Mr. Paul's quarries, and Mr. Adams told Mr. Walstad that three quarry ledges would be possible on the Paul-Adams property.[17]

IX. *Formation of Paul-Adams and Granting of Easement*

Recall that Mr. Paul and FLA Enterprises, LLC (an entity owned by Mr. Adams), acquired the Paul-Adams property in 2007. In October 2014, FLA Enterprises, LLC, transferred its one-half interest in the Paul-Adams property to Mr. Adams, such that he owned the one-half interest directly.

In December 2016, Mr. Adams and Mr. Paul formed Paul-Adams as a member-managed Georgia limited liability company. Shortly thereafter, Mr. Adams and Mr. Paul transferred ownership of the Paul-Adams property to Paul-Adams by executing a warranty deed. Initially, Mr. Adams and Mr. Paul each owned 50% of Paul-Adams directly, but on December 14, 2017, Mr. Paul assigned his interest in Paul-Adams to R.E. Paul Partners, LLC, an entity in which his children and a grandchild eventually obtained interests.

---

[17] Granite is often extracted in a way that creates "ledges" for groups of workers to stand on while they extract additional blocks of granite.

[*25] On December 22, 2017, Paul-Adams executed a deed of conservation easement over the Paul-Adams property in favor of the Oconee Trust. The deed was recorded with the Elbert County Clerk of Superior Court the same day. Oconee Trust issued a letter to Paul-Adams dated December 28, 2017, acknowledging receipt of the easement contribution.

X.    *Facilitating Work and Appraisal*

As part of facilitating the Paul-Adams easement transaction, Mooncrest and Mr. Walstad arranged for drilling on the Paul-Adams property and for a geologist to visit the property and prepare a report. In addition, Greencone engaged an appraiser to appraise the property.

A.    *Drilling Report*

In May 2017, Scott Towe of Premier Drilling, LLC, was engaged to bore for granite samples on the Paul-Adams property. Mr. Towe drilled three boreholes on the property, all on the northern portion. Two of the boreholes were drilled 100 feet deep on granite outcroppings north of the abandoned quarry. The third hole was drilled 35 feet deep near the abandoned quarry. Mr. Towe did not select the locations or the depths; rather he was instructed as to where and how deep to drill, but did not recall who provided that instruction. Premier Drilling's typical practice would have been to drill to 100 feet deep for each borehole. The cores from each borehole were collected and photographed, and a portion of the core from one borehole was tested.

The first borehole, located near the northernmost portion of the property, showed brown material for the first two feet, gray colored and solid granite for the next four two-foot sections, and broken sections of gray and brown materials around 13 feet. Then the sample showed relatively uniform and solid gray colored granite between 14 feet and 94 feet, with a brief interval of brown at about 43 feet and the last six feet being broken stone. Thus, the first borehole showed fairly consistent and larger intervals of gray granite that could be sold as Georgia Gray.

The second borehole, located near the northeast corner of the property, was less successful. Its sample showed that brown and broken granite was present intermittently throughout the entire length of the borehole including down to the deepest part of the granite at 80 feet. Deeper than 80 feet, the sample consisted of gneiss.

**[\*26]** The third borehole, located near the abandoned quarry, showed a large 10- to 12-foot interval of brown granite near the surface and a short interval of white granite around 20 feet deep. The hole was stopped at 35 feet, as we have noted.

### B. *Geology Report*

Mr. Walstad also engaged Paul A. Schroeder, a professor in the Department of Geology at the University of Georgia, to visit the Paul-Adams property and prepare a geological assessment of the property. As we will discuss further, Dr. Schroeder prepared a report dated August 31, 2017, and entitled "Geology and regional dimension stone and aggregate industry analysis for the Adams tract, Elbert County, Georgia" (Geology Report). The Geology Report discussed granite deposits on the Paul-Adams property and potential uses of those deposits as aggregate or dimension stone quarries.

The Geology Report concluded that there was "support [for] the notion that quality granite and gneiss rock suitable for GDOT aggregate product and possible dimension stone underlies the [property]." Ex. 402-P, p. 8. The Geology Report recommended further exploration and study of the property's northern sector, explaining that the southern sector likely was not suitable for dimension stone production. The Geology Report estimated yields from the "inferred reserves" at the property "[i]f an aggregate quarry was sited [there] and economic conditions [were] favorable." *Id.*

Dr. Schroeder disclaimed instructing Premier Drilling as to the depth of the third borehole.

### C. *Appraisal Report*

Also in 2017, Greencone engaged Robert J. Fletcher, a Georgia certified General Real Estate Appraiser, to appraise the Paul-Adams property and the easement that Paul-Adams would eventually contribute. Mr. Walstad met with Mr. Fletcher and provided him with information regarding the Paul-Adams property. At some point, Mr. Walstad also provided Mr. Fletcher with an Excel spreadsheet that Mr. Fletcher later used in working on his appraisal. But the record does not reflect what information the spreadsheet included.

Ultimately, Mr. Fletcher visited the Paul-Adams property and prepared an appraisal report. The appraisal was dated April 9, 2018, and stated that its effective date was December 22, 2017.

[*27] The appraisal calculated the value of the easement by first concluding that the value of the Paul-Adams property before the donation was $10,545,088, based on a highest and best use as an active granite dimension stone mine. The appraisal reduced that amount by the value of the property after the donation, $310,980. This value was based on a highest and best use of passive recreation, forestry, and agricultural uses as permitted by the easement. The appraisal concluded that the value of the conservation easement was $10,234,108. In the course of preparing the appraisal, Mr. Fletcher was not given financial records reflecting the mining on the property from 2010 to 2012, and so the appraisal did not account for that information.

XI.    *Tax Returns and IRS Examination*

Paul-Adams filed a 2017 Form 1065 for the short tax year ending December 31, 2017 (2017 Form 1065). Two Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., were attached to the return, one for Mr. Adams and one for R.E. Paul Partners, LLC. Each Schedule K–1 reported that the partner had made a capital contribution during the year of $265,092, checked a box indicating that the amount reflects "Tax basis," and further checked a box indicating that the partner did *not* contribute property with built-in gain or loss. Additionally, Schedule M–2, Analysis of Partners' Capital Accounts, reported capital contributions for 2017 of $112,376 in cash and $417,808 in property.

The return also claimed a total charitable contribution deduction of $10,244,108. Of this total amount, $10,234,108 was attributable to the conveyance of the conservation easement over the Paul-Adams property, and the remaining $10,000 reflected a cash contribution to Oconee Trust.

A Form 8283, Noncash Charitable Contributions, attached to the 2017 Form 1065 reported a fair market value of the conservation easement of $10,234,108. An attachment to the Form 8283 reported that the appraised fair market value of the Paul-Adams property before the donation of the easement was $10,545,088 and the fair market value after the donation was $310,980. The 2017 Form 1065 included a copy of Mr. Fletcher's appraisal dated April 9, 2018.

The IRS examined Paul-Adams's 2017 Form 1065. On March 19, 2021, the Commissioner issued to petitioner a Notice of Final Partnership Administrative Adjustment (FPAA) for Paul-Adams's tax

[*28] year ended December 31, 2017. The FPAA denied $10,234,108 of Paul-Adam's charitable contribution deduction (the full amount attributable to the conservation easement) and also determined a 40% accuracy-related penalty under section 6662(h) or, in the alternative, a 20% reportable transaction understatement penalty under section 6662A.[18] To the extent neither of those penalties applied, the FPAA determined a section 6662(a) 20% accuracy-related penalty for an underpayment due to a substantial understatement of income tax under section 6662(b)(2) and (d) and for negligence and disregard of rules and regulations under section 6662(b)(1) and (c).

Petitioner timely petitioned our Court for review.

## XII. *Trial*

During an eight-day trial of this case, the parties called various witnesses to (among other things) establish the value of the easement that Paul-Adams contributed.[19] Among those witnesses were the following experts.

### A. *Petitioner's Experts*

#### 1. *Dr. Schroeder*

Petitioner offered expert testimony from Dr. Schroeder, whom the Court recognized as an expert in geology and the Elberton granite deposit. Dr. Schroeder reviewed sources from the U.S. Geological Survey (USGS), an agency within the Department of the Interior, concerning the geology of the Paul-Adams property and performed a site visit to observe and collect samples. He also reviewed the results of core samples drilled and tested by Premier Drilling.

Dr. Schroeder testified as to the presence of granite beneath the Paul-Adams property. He determined that granite was present beneath the surface of the northeast sector. Given the results of tests run on three bore samples taken from the property, he opined that the granite beneath the property would be suitable for use as aggregate stone. He

---

[18] The Commissioner has conceded the penalty under section 6662A, and we do not discuss it further.

[19] In lieu of calling one witness, Randy Rice, the parties agreed to submit for the record Mr. Rice's testimony in a prior trial in this Court.

**[\*29]** also opined that the Paul-Adams property holds granite dimension stone.

Dr. Schroeder estimated the volume of granite available below the Paul-Adams property. He stated that additional drilling and rock testing would be necessary to determine the actual volume of granite, but suggested that a 30-acre pit quarry on the property would hold 10.7 million tons of potential aggregate. Further, he stated that, based on the average price of aggregate, the gross value of the quarry would be $140 million and that it could yield a gross yearly revenue of $6.5 million.

And Dr. Schroeder discussed the markets for aggregate stone and dimension stone in Elbert County. He noted that demand for aggregate products has been modestly increasing, writing that "[a]s demand for aggregate products improves, the prospects of opening a quarrying business on the property may become more attractive." Ex. 402-P, p. 27. With respect to dimension stone, he reported that prices have been static for roughly 25 years, owing in part to local and foreign competition, and that market conditions prevented raising prices. He also specified, while discussing an ongoing quarry operation in Elberton, that "[p]roduction could be increased, but the amount they have orders for limits their yield." Ex. 402-P, p. 34.

### 2. *Nick Proctor*

Petitioner offered expert testimony from Nick Proctor, director of evaluations and engineering at Burgex Mining Consultants. Mr. Proctor was recognized as an expert in mineral economics and granite market studies. He offered an opinion regarding the value of granite that could be mined at the Paul-Adams property. For this purpose, Mr. Proctor used a discounted cashflow income approach.

We explained in *Ranch Springs, LLC v. Commissioner*, No. 11794-21, 164 T.C., slip op. at 54–62 (Mar. 31, 2025), that the income approach comes in more than one flavor, including (as relevant here) what we called "the owner-operator method" and the "royalty income method." Mr. Proctor's Report used both versions of the income approach.

Under the owner-operator method, Mr. Proctor modeled the Paul-Adams property as an expanding drive-in quarry that would ramp up, over its initial years, from one crew to two and from zero active quarrying ledges to two. Mr. Proctor located his proposed drive-in

**[\*30]** quarry at the site of the abandoned pit quarry. Drawing from Dr. Schroeder's Geology Report, Mr. Proctor accepted an estimate that a 30-acre quarry would contain approximately 130.7 million cubic feet of granite (representing the 10.7 million tons of potential aggregate that Dr. Schroeder had projected, converted to cubic feet, which is how dimension stone production is measured). Mr. Proctor assumed that the granite mined from the Paul-Adams property would be dimension stone and that 80% of the stone obtained from the property could be sold. He also applied a 9% discount rate in his analysis. Mr. Proctor valued the hypothetical quarry operation at $12,157,000.

Using the royalty income method, Mr. Proctor prepared a valuation for the prospect of leasing the Paul-Adams property in exchange for a royalty on quarrying activities. Under this approach, Mr. Proctor concluded that the royalty stream would have a net present value of $5,349,000.

### 3.  *Mr. Fletcher*

Petitioner further offered expert testimony from Mr. Fletcher. Mr. Fletcher conducted the 2017 appraisal of the Paul-Adams property that Paul-Adams attached to its return. We recognized Mr. Fletcher as an expert in real estate appraisals.[20] During his testimony, Mr. Fletcher opined on the value of the Paul-Adams property.

Mr. Fletcher concluded that "mineral extraction, specifically either dimension stone or aggregate stone production[]" was the highest and best use for the Paul-Adams property in 2017. Ex. 403-P, p. 28. He then modeled a hypothetical dimension stone quarry on the property using the owner-operator method of the income approach.

Mr. Fletcher assumed that the quarry would produce 100,000 cubic feet annually in the early years, growing to 350,000 cubic feet later on and that 75% of the quarry's mined granite would be salable. And he set an average price of $13.10 per cubic foot of granite, increasing by 3% annually.

Based on his assumed and estimated values, Mr. Fletcher calculated the cashflow of a hypothetical quarry over a 15-year period.

---

[20] We reserved ruling on whether Mr. Fletcher was a qualified appraiser with respect to the Paul-Adams property. For further discussion of the qualified appraiser issue, see Opinion Part II below.

**[\*31]** Applying a 12% discount rate, he determined that the net present value of a dimension stone quarry was $10,545,088.

To estimate the value of the Paul-Adams property after the easement, Mr. Fletcher used the comparable sales method. He examined the sales of ten eased properties in Georgia. Mr. Fletcher took a closer look at three such sales, choosing a $1,500-per-acre price for the Paul-Adams property. Applied to the Paul-Adams property, that price yielded an "after" value of $310,980. Thus, Mr. Fletcher valued the easement at $10,234,108 (i.e., $10,545,088 less $310,980).

4. *Benjamin Black*

Petitioner also offered expert testimony from Benjamin Black, the owner and Principal Geological Engineer of GeoLogic, LLC, and a Registered Professional Geologist in Georgia. We recognized him as an expert in geologic testing, geologic investigation, mineral resource evaluation, and suitability of property for stone development.

Mr. Black conducted a site inspection and reviewed geological maps of the property, Dr. Schroeder's Geology Report, and the rock core samples taken from the property. GeoLogic also performed additional testing on the rock core samples taken from the Paul-Adams property. After reviewing the samples, the property, and Dr. Schroeder's Geology Report, Mr. Black determined that he could estimate an "indicated mineral resource" beneath the property.[21]

To estimate the resource, Mr. Black designed a dimension stone quarry model and an aggregate stone quarry model. His dimension stone quarry model had a four-acre surface footprint, and Mr. Black

---

[21] An indicated mineral resource is a category of classification of minerals reflected in the SME Guide. The SME Guide for 2017 defines an indicated mineral resource as follows:

> [T]hat part of a Mineral Resource for which quantity, grade or quality, densities, shape, and physical characteristics are estimated with sufficient confidence to allow the application of Modifying Factors in sufficient detail to support mine planning and evaluation of the economic viability of the deposit. Geological evidence is derived from adequately detailed and reliable exploration, sampling, and testing and is sufficient to assume geological and grade or quality continuity between points of observation. An Indicated Mineral Resource has a lower level of confidence than that applying to a Measured Mineral Resource and may only be converted to a Probable Mineral Reserve.

Ex. 400-P, p. 22.

[*32] estimated that 15.6 million cubic feet of stone could be extracted from the quarry. Mr. Black's hypothetical quarry was placed in a location on the property different from Mr. Proctor's hypothetical quarry. Mr. Black also developed a model for an aggregate stone pit quarry with a 31.4-acre surface footprint.

B. *The Commissioner's Expert, Andy Sheppard*

The Commissioner offered expert testimony from Andy Sheppard, a Georgia certified general real property appraiser from Pritchett, Ball, & Wise, Inc. We recognized Mr. Sheppard as an expert in real estate appraisal and the appraisal of conservation easements. Mr. Sheppard conducted a retrospective appraisal of the Paul-Adams property and opined on the value of the easement. Mr. Sheppard used the comparable sales method, rather than the income method, to determine the value of the Paul-Adams property before and after the grant of the easement.

To appraise the Paul-Adams property before the grant of the easement, Mr. Sheppard began by examining a large sample of sales from Elbert County and neighboring counties in the years since 2000. He looked for transactions regarding property on the Elberton granite deposit, and involving mineral-named entities, to find transactions in the granite quarry or potential quarry market. Ultimately, he narrowed his sample to four properties sold in 2018 and 2019. After adjusting their per-acre prices based on some dissimilarities to the Paul-Adams property, he estimated a fair market value price of $4,750 per acre. Based on that price, he determined a rounded "before" value of $985,000.

Mr. Sheppard also used the comparable sales method to value the property after the granting of the easement. He examined every conservation easement property in Georgia from 2000 through 2022, determining that 92 of them sold between 2010 and 2022. As with the "before" valuation, he selected four comparable properties and determined a per-acre price of $1,800 for the Paul-Adams property. At that price, the property would be worth $373,000. Taken together, his numbers yield an easement value of $612,000 (i.e., $985,000 less $373,000).

C. *Rebuttal Experts*

Petitioner offered expert testimony from Doug Kenny of Kenny & Associates to rebut the testimony of Mr. Sheppard. We recognized Mr. Kenny as an expert in real estate appraisal and appraisal review. Mr. Kenny testified that Mr. Sheppard had not verified the sales that

[*33] he relied upon, rendering his appraisal unreliable. He provided additional information regarding those sales. Mr. Kenny also pointed out the absence of a royalty analysis from Mr. Sheppard's Report, stating that an income method analysis of a royalty arrangement would have made Mr. Sheppard's Report more accurate.

The Commissioner offered expert testimony from Kevin Gunesch, a mining engineer and licensed professional engineer in Georgia who provides independent consulting services as a Principal Consultant – Mining Engineer with SRK Consulting, Inc. We recognized Mr. Gunesch as an expert in mining engineering and mineral resource and reserve evaluation. Mr. Gunesch opined on petitioner's expert Reports by Mr. Black, Mr. Proctor, and Dr. Schroeder.

Mr. Gunesch disagreed with the Reports of Dr. Schroeder and Mr. Black, petitioner's geological experts. Specifically, Mr. Gunesch noted that Dr. Schroeder's Geology Report did "not provide a quarry pit design and [did] not present a dimension stone operation considering revenue, capital costs, and operational costs." Ex. 601-R, p. 18. He also disagreed with the findings of Mr. Black's Report because the Report provided only conceptual designs without also discussing proposed quarry operations on the site. Mr. Gunesch opined that concluding reasonable prospects exist for economic extraction of minerals, without considering costs and revenues, meant no category of mineral resource could be stated. And he disagreed with Mr. Black regarding the color continuity of the granite samples taken from the Paul-Adams property.

Mr. Gunesch also took issue with the valuation analyses provided by Mr. Proctor. He opined that the conceptual designs for a dimension stone quarry provided by Mr. Proctor were inherently flawed and that Mr. Proctor used a financial analysis that grossly overstated the likely quarry recovery. Specifically, Mr. Gunesch believed that Mr. Proctor's hypothetical quarry would extract more gneiss than granite and overstated possible granite production generally. Additionally, Mr. Gunesch opined that the prices used in Mr. Proctor's analysis were overstated.

## OPINION

I.    *Burden of Proof*

Rule 142(a)(1) provides that "[t]he burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court." Generally, the Commissioner's adjustments in an FPAA are

**[\*34]** presumed to be correct, and petitioner bears the burden of proving them wrong. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013). Petitioner bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a petitioner claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* I.R.C. § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

As to the burden of production, section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount." However, section 7491(c) does not apply to TEFRA partnership-level proceedings (such as this case). *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 234 (2018). Consequently, as a general rule, in a TEFRA partnership case, the petitioner has not only the burden of proof, but also the burden of production, even as to any penalty.

If, in any court proceeding, the petitioner puts forth credible evidence with respect to any factual issue relevant to ascertaining the liability at issue and meets certain other requirements, the burden of proof shifts to the Commissioner as to that issue. I.R.C. § 7491(a)(1) and (2).

When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. We do not perceive an evidentiary tie in this case and are able to decide the remaining issues on the preponderance of the evidence. *See, e.g., Esgar Corp. v. Commissioner*, 744 F.3d 648, 653–54 (10th Cir. 2014), *aff'g* T.C. Memo. 2012-35, 2012 WL 371809.

We note that, in his Pretrial Memorandum, petitioner argued that the Commissioner should bear the burden of proof because, in petitioner's view, (1) the FPAA was erroneous, excessive, and unreasonable, as well as arbitrary and capricious, and (2) petitioner would satisfy the requirements of section 7491(a)(1) and (2). Petitioner

**[\*35]** has not satisfied the requirements of section 7491(a)(1) and (2). And in *Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53, at \*22–36, we recently rejected arguments similar to those offered by petitioner. We do so now as well, although, as already noted, we perceive no evidentiary tie, so the burden of proof has no real significance here. *See, e.g., Esgar Corp. v. Commissioner*, 744 F.3d at 653–54.

II.    *Substantiation of the Charitable Contribution Deduction*

Section 170(a) allows a deduction for a charitable contribution, which section 170(c) defines as including a "contribution or gift" to or for the use of a charity. By stipulation and concession, the parties have resolved most of the issues concerning the formal requirements of section 170. But section 170(f)(11) disallows a deduction for certain noncash charitable contributions unless specified substantiation and documentation requirements are met.

In the case of a contribution of property valued in excess of $500,000, the taxpayer must obtain and attach to his return "a qualified appraisal of such property." I.R.C. § 170(f)(11)(D). An appraisal is "qualified" only if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary." I.R.C. § 170(f)(11)(E)(i). In the case of a partnership or an S corporation, the qualified appraisal requirements "shall be applied at the entity level." I.R.C. § 170(f)(11)(G).

Treasury Regulation § 1.170A-13(c)(3)(i) defines a qualified appraisal as a document that, among other things, is prepared, signed, and dated by a qualified appraiser. Here Paul-Adams obtained an appraisal of the easement from Mr. Fletcher and attached that appraisal to its 2017 return. Nevertheless, the Commissioner argues that Paul-Adams failed to meet the "qualified appraisal" requirement because, in his view, Mr. Fletcher was not a "qualified appraiser" under Treasury Regulation § 1.170A-13(c)(3)(i)(B) and (5). Petitioner disagrees. As we explain below, we agree with petitioner that Mr. Fletcher was a qualified appraiser, if only barely. Thus, we conclude that Paul-Adams's deduction has been sufficiently substantiated.

The Commissioner seeks to reject Mr. Fletcher as a qualified appraiser under the theory that he runs afoul of subdivision (ii) of Treasury Regulation § 1.170A-13(c)(5), the so-called knowledge

[*36] regulation. Treasury Regulation § 1.170A-13(c)(5)(ii) provides that an appraiser is not qualified if "the donor [here, Paul-Adams] had knowledge of facts that would cause a reasonable person to expect the appraiser [here, Mr. Fletcher] falsely to overstate the value of the donated property." In gauging a partnership's "knowledge," we look to the knowledge of the person(s) with ultimate authority to manage the partnership, here, Mr. Adams and Mr. Paul. *See, e.g.*, *Ranch Springs*, 164 T.C., slip op. at 32–33; *Jackson Crossroads*, T.C. Memo. 2024-111, at *25 (collecting authorities). A partnership cannot avoid the application of the regulation merely by communicating with an appraiser through its agent or its manager's agent (here, Mr. Walstad). *See, e.g.*, *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at *44 (holding that, for purposes of assessing whether there was collusion between an appraiser and a partnership, "[c]ommunication can occur directly or can be accomplished indirectly through agents and intermediaries"), *supplemented by* T.C. Memo. 2024-73.

Reading the relevant regulation closely, we observe that it is not the appraisal that may become disqualified, but rather the appraiser. We further observe that the appraiser does not become disqualified simply because (1) the appraiser incompetently or carelessly overstated the value, and/or (2) the donor knew that the appraiser overstated the value, and/or (3) the donor knew facts about the property that caused the value to be overstated. Rather, this disqualification occurs when the donor knows facts that do or should cause him to expect the appraiser to falsely overstate the value. *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *42. Such facts ordinarily will be facts about the appraiser, and the resulting expectation is not just an incorrect overstated value but a "falsely" overstated value. *Id.*

Thus, Treasury Regulation § 1.170A-13(c)(5)(ii) provides the following illustration: "[T]he donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property." *See also Ranch Springs*, 164 T.C., slip op. at 32. Of course, such an agreement would be a fact about the appraiser that is known to the donor; and a valuation known to be in excess of fair market value but agreed to nonetheless would be not just an incorrect amount but a culpably "false[]" overstatement of value. *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *42.

**[*37]** The Commissioner has shown that Mr. Adams participated in multiple conservation easement transactions and that Mr. Fletcher appraised the conservation easements in at least some of those transactions. And, the Commissioner argues, Mr. Adams knew that the values determined by Mr. Fletcher with respect to those conservation easements were inflated.

Further, the Commissioner argues that Paul-Adams, through Mr. Walstad, provided discounted cashflow projections directly to Mr. Fletcher to influence his appraisal. In support of that view, the Commissioner demonstrated that Mr. Fletcher's work file contained a spreadsheet, the metadata for which listed Mr. Walstad as its author. That spreadsheet contained, at the time of trial, a discounted cashflow model that appears to be the same as the model included in Mr. Fletcher's appraisal for Paul-Adams.

Taken together, the Commissioner's argument is that Mr. Adams (and thereby Paul-Adams) knew that Mr. Fletcher could be relied upon to produce an inflated appraisal. To ensure an overvaluation, the argument continues, Mr. Walstad provided a model to Mr. Fletcher to indicate a desired value or assumptions. Mr. Fletcher then used the model to develop his own discounted cashflow appraisal, deviating only somewhat from provided values.

Although there is considerable force to the Commissioner's argument, we ultimately are unable to conclude that Paul-Adams had the requisite knowledge to trigger Treasury Regulation § 1.170A-13(c)(5)(ii). The record as a whole does not reflect that Mr. Adams or Mr. Walstad communicated an interest in an inflated appraisal to Mr. Fletcher or came to an agreement with Mr. Fletcher regarding the value of Paul-Adams's easement.

As for the spreadsheet created by Mr. Walstad and found in Mr. Fletcher's work file, the record does not establish that Mr. Walstad was the author of the discounted cashflow analysis included in the Fletcher report or that he colluded with Mr. Fletcher to inflate the result.

All told, Mr. Adams and Mr. Walstad may have had knowledge permitting an expectation that Mr. Fletcher would reach a high value for the Paul-Adams easement. And they may have sought Mr. Fletcher out based on that knowledge. Nevertheless, the record as a whole does not establish that their knowledge led to an expectation that

**[*38]** Mr. Fletcher would *falsely* overvalue the Paul-Adams easement. *See, e.g.*, *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *42.

The Commissioner urges us to apply the relevant authorities more broadly, but, as in prior cases, we decline to do so. *See, e.g.*, *Ranch Springs*, 164 T.C., slip op. at 32–33; *Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at *32–35; *J L Mins., LLC v. Commissioner*, T.C. Memo. 2024-93, at *38–39; *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at *42–43. The Code elsewhere imposes consequences for overstated value (e.g., disallowance of the overstated deduction) and even for grossly overstated value (e.g., the 40% penalty we discuss below). *See Seabrook*, T.C. Memo. 2025-6, at *32–35. The regulatory text we construe here is manifestly focused on something beyond that: a taxpayer-donor's knowledge of an appraiser's deception. *Id.* The evidence in the record here does not show that type of knowledge.

We therefore hold that Mr. Fletcher was a "qualified appraiser" under Treasury Regulation § 1.170A-13(c)(5) with respect to the Paul-Adams easement. But make no mistake: This is a close call. We are troubled that Mr. Adams or Mr. Walstad may have fed bad information to Mr. Fletcher in order to obtain a high valuation. The presence of Mr. Walstad's digital fingerprints in documents within Mr. Fletcher's work file raises eyebrows further. While we conclude that Mr. Fletcher was a "qualified appraiser" with respect to the Paul-Adams property, conduct not far removed from that alleged here could very well violate the knowledge regulation.

III. *Amount of the Deduction*

A. *General Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property other than money is the "fair market value" of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021).[22] Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both

---

[22] Absent stipulation to the contrary, *see* I.R.C. § 7482(b)(2), appeal of this case would lie to the U.S. Court of Appeals for the Eleventh Circuit, *see* I.R.C. § 7482(b)(1).

**[\*39]** having reasonable knowledge of relevant facts." *See also Anselmo v. Commissioner*, 757 F.2d 1208, 1213 (11th Cir. 1985), *aff'g* 80 T.C. 872 (1983). "This definition, a fixture in the Treasury Regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property." *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*27; *see also Value, Black's Law Dictionary* (4th ed. 1968) (defining "'[v]alue' of land for purpose of taxation" as the "price that would probably be paid therefor after fair negotiations between willing seller and buyer"); Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 3 (1971) (defining fair market value as "the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obligated to buy").

The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 ("A determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to *de novo* review." (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 994 (11th Cir. 2016), *aff'g in part, rev'g in part and remanding* T.C. Memo. 2014-79)). "Valuation is not an exact science and each case necessarily turns on its own particular facts." *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1228 (1987); *see also Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013-27, at \*33 ("Fair market value is a question of judgment rather than mathematics." (citing *Hamm v. Commissioner*, 325 F.2d 934, 940 (8th Cir. 1963), *aff'g* T.C. Memo. 1961-347)). As the Supreme Court observed long ago, "[a]t best, evidence of value is largely a matter of opinion, especially as to real estate." *Montana Ry. v. Warren*, 137 U.S. 348, 353 (1890).

The parties have retained experts to assist our inquiry. We evaluate their opinions in light of each expert's qualifications and the evidence in the record, and we may accept an "opinion in toto or accept aspects . . . that we find reliable." *Oconee Landing*, T.C. Memo. 2024-25, at \*58; *see also Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*35. We also "may determine fair market value on the basis of our own examination of the evidence in the record." *Savannah Shoals*, T.C. Memo. 2024-35, at \*35; *see also Beaverdam*, T.C. Memo.

**[\*40]** 2025-53, at \*56; *Seabrook*, T.C. Memo. 2025-6, at \*44; *Jackson Crossroads*, T.C. Memo. 2024-111, at \*35; *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*51, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sept. 2, 2025).

In this case we do not have a substantial record of sales of easements comparable to the donated easement. The parties therefore agree that the easement should be valued by calculating the fair market value of the easement property before and after Paul-Adams granted the easement. *See, e.g.*, *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 ("'[I]f no substantial record of market-place sales is available to use as a meaningful or valid comparison,' the 'before-and-after' valuation method is used." (quoting Treas. Reg. § 1.170A-14(h)(3)(i))); *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7.

In deciding the "before value," we must take into account not only the actual use of the easement property when the easement was granted in December 2017, but also its highest and best use. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369–70; *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); *see also* Treas. Reg. § 1.170A-14(h)(3)(ii) ("If before and after valuation is used, the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use."). Although this "concept 'is an element in the determination of fair market value, . . . it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value.'" *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at \*47 (quoting *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)); *see also Corning Place*, T.C. Memo. 2024-72, at \*41.

B.    *Highest and Best Use*

1.    *Legal Principles*

"To determine a property's highest and best reasonably probable use, the court focuses on '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Palmer Ranch Holdings Ltd. v. Commissioner*,

[*41] 812 F.3d at 996 (quoting *Symington v. Commissioner*, 87 T.C. 892, 897 (1986));[23] *accord Olson*, 292 U.S. at 255.  We have said that "[a]ny realistically available special use of property due to its adaptability to a particular business is an element that must be considered in determining the fair market value thereof."  *Stanley Works*, 87 T.C. at 400.  At the same time, "[b]efore an additional element of value may be attributed to potential use of property for the [alleged special use], the taxpayer must establish that there existed a reasonable probability the land would be so used in the reasonably near future."  *Id.* at 401 (citing *Olson*, 292 U.S. at 257).

We have defined highest and best use as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value."  *Oconee Landing*, T.C. Memo. 2024-25, at *59 (quoting *Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse III*), 139 T.C. 304, 331 (2012), *aff'd in part, vacated in part, and remanded*, 755 F.3d 236 (5th Cir. 2014)); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369–70; *Ranch Springs*, 164 T.C., slip op. at 41; *Savannah Shoals*, T.C. Memo. 2024-35, at *37.  "The highest and best use inquiry is one of objective probabilities."  *Esgar Corp. v. Commissioner*, 744 F.3d at 657.

"While highest and best use can be any realistic, objective potential use of the property, it is presumed to be the use to which the land is currently being put absent proof to the contrary."  *Esgar Corp. v. Commissioner*, 2012 WL 371809, at *7; *see also United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962) ("Ordinarily, the highest and best use for property sought to be condemned is the use to which it is subjected

---

[23] In a recent unpublished decision affirming an opinion of this Court, *Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at *6, the Eleventh Circuit observed:

In applying the highest-and-best-use standard, courts account for several factors, including (1) the current use of the property, (2) the likelihood that the property would be developed absent the easement, (3) how the property would be developed, and (4) "any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use."  *TOT Prop. Holdings*, 1 F.4th at 1369 (quoting 26 C.F.R. § 1.170A-14(h)(3)(ii)).

Eleventh Circuit Rule 36-2 provides, in relevant part, that "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  We cite the *Buckelew Farm* opinion for that purpose.

**[\*42]** at the time of the taking.”);[24] *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993) (“In the absence of proof to the contrary, the current use is presumed to be the best use.” (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991))). This is so “[b]ecause property owners have an economic incentive to put their land to its most productive use.” *Ranch Springs*, 164 T.C., slip op. at 41 (collecting authorities); *see also Buhler*, 305 F.2d at 328 (grounding the presumption on the fact that “economic demands normally result in an owner’s putting his land to the most advantageous use”).

Where “an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value.” *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7 (citing *69.1 Acres of Land*, 942 F.2d at 292). Or, as we put it in another case, a proposed highest and best use different from the current use requires both “closeness in time” and “reasonable probability.” *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985); *see also Ranch Springs*, 164 T.C., slip op. at 34; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*30; *Savannah Shoals*, T.C. Memo. 2024-35, at \*37; *Oconee Landing*, T.C. Memo. 2024-25, at \*65.

“Where, as here, the parties proposed different uses, we consider ‘[i]f there is too high a chance that the property will not achieve the proposed use in the near future,’ in which case ‘the use is too risky to qualify.’” *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). “The principle can also be articulated in terms of willingness to pay. If a proposed use is too risky for ‘a hypothetical willing buyer [to] consider [the use] in deciding how much to pay for the property,’ then the use should not be deemed the highest and best available.” *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000 n.14 (quoting *Whitehouse Hotel Ltd. P’ship v. Commissioner* (*Whitehouse II*), 615 F.3d 321, 335 (5th Cir. 2010), *vacating and remanding* 131 T.C. 112 (2008)).

The Supreme Court’s decision in *Olson* aptly illustrates how the analysis works. We quote here from our opinion in *Stanley Works*, 87 T.C. at 401 (footnote omitted):

---

[24] Decisions from the U.S. Court of Appeals for the Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

**[*43]**      In *Olson v. United States*, the United States instituted a condemnation proceeding to acquire water drainage easements over certain property in Minnesota adjacent to a lake which straddles the U.S.-Canadian border.  The property owner argued that his property, if joined with several adjacent properties, could have been used for construction of a power plant, and that the fair market value of damages to the property as a result of the easements the Government obtained should reflect that potential use of the property.  The Supreme Court held that, in spite of the suitability of the property in question for construction of a power plant, there was no reasonable probability the property would be acquired for that purpose in the reasonably foreseeable future.  The Court held, therefore, that no element of the property's value legitimately could be attributed to the suitability of the property for construction of a power plant.  The Supreme Court stated in *Olson*—

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. * * * [292 U.S. at 257.]

With these principles in mind, we turn to consider the highest and best use of the Paul-Adams property.

2.      *Highest and Best Use of the Property Before the Easement Was Granted*

a.      *Actual Use in December 2017*

We start by considering how the Paul-Adams property was being used in December 2017.  The property was then being held vacant, purportedly with an eye for potential future quarrying should Mr. Paul's and Mr. Adams's businesses need it.  No actual quarrying operations

[*44] had taken place on the property for about five years. The existing pit was full of water and inactive. And the abandoned quarry was a small pit quarry; there was no drive-in quarry.

Thus, as of December 2017, two successful businessmen with, collectively, more than ten decades in the granite dimension stone industry were not using the property for quarrying, but were simply holding it for the future. Under the authorities cited above, the starting assumption is that this was the highest and best use of the property and that its value should not include the value of an operating quarry or the value of granite that might be extracted by a hypothetical quarry.

b.    *Reasonably Probable Future Use*

That is the beginning of the analysis, but not the end. As we have already noted, and as the Eleventh Circuit has observed, in determining the highest and best reasonably probable use of the property, we must consider "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 996. Or, as the Court colorfully put in *Stanley Works*, paraphrasing a 1913 case from the Georgia Supreme Court, the landowner may have used a valuable corner of property for a stable or for a pigsty, but he is not obliged to have it priced on that basis. *Stanley Works*, 87 T.C. at 400.

But note carefully the timeframe for this inquiry. It focuses on the reasonably near future. *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 996; *Stanley Works*, 87 T.C. at 401. Treasury Regulation § 1.170A-14(h)(3)(ii) echoes this requirement by calling for "an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed."

c.    *Petitioner's Proposed Highest and Best Use*

Petitioner contends that the highest and best use of the Paul-Adams property as of December 2017 was as an active quarry. The parties have stipulated that active quarrying was physically possible and legally permissible on the Paul-Adams property. But we conclude the record does not support a finding that quarrying on the property was financially feasible. *See, e.g.*, *Oconee Landing*, T.C. Memo. 2024-25, at *59. Accordingly, we find as a factual matter that the record does not support petitioner's proposed highest and best use.

**[\*45]**          i.  *Mr. Adams's and Mr. Paul's Own Actions*

Take first Mr. Adams's and Mr. Paul's own actions. As businessmen experienced in the dimension stone business in Elberton, they quarried the property between 2010 and 2012. They brought in crews from their other operations and put Mr. Adams's son Mark (himself an experienced quarryman) in charge of the operation. They attempted to get salable product out of the property. And eventually they closed up shop. The tax returns in which the results of these activities were reported show losses of $358,794.

A fair inference from these facts (which we make as a factual finding) is that the quarrying operations on the property were not successful. Put another way, this is not a case where the property owners were using a valuable corner of property for a stable or for a pigsty and should not be stuck with that use for valuation purposes. The property owners attempted to use the property for the very use now pressed on us. And, based on all we can tell from the record (aside from testimony that we do not credit because we do not find it believable), they could not make a profitable go of it. Hypothetical willing buyers would not ignore this data and simply assume without any evidence that they would do better than Mr. Adams and Mr. Paul.

Mr. Adams and Mr. Paul maintain that their operations in 2010–12 were simply exploratory. They claim their efforts were designed to find out whether the property had suitable granite dimension stone, but were not intended to result in full blown quarry operations at the property because their needs for such granite were already being met. Put another way, they say they simply attempted to find out whether good granite existed on the property, found out that it did, and decided to stop further quarrying because the mission was accomplished. As we show below, we find as a fact that this claim is not credible. *See Diaz v. Commissioner*, 58 T.C. 560, 564 (1972) ("[T]he distillation of truth from falsehood . . . is the daily grist of judicial life."); *Mazotti v. Commissioner*, T.C. Memo. 2024-75, at \*8–9 ("As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." (quoting *Kropp v. Commissioner*, T.C. Memo. 2000-148, 2000 WL 472840, at \*3)). And in view of that fact, we believe hypothetical willing buyers would not credit the proffered explanations when assessing whether the Paul-Adams property's highest and best use was as an active quarry.

[*46] We return briefly to Mr. Adams's activities with Star Granite, the fabrication business he owned. Around 2011, the demands on Star Granite increased. Three of Star Granite's major customers combined into a single multinational company. That required Star Granite to produce more and more varied products. And, at that time, Mr. Adams knew he would need to buy and operate a quarry to supply Star Granite's needs at some point. As early as 2011, he was looking for the right quarry to purchase. In short, by 2011 and 2012, Mr. Adams needed a quarry to supply Star Granite.

If, as Mr. Adams and Mr. Paul maintain, the exploratory activities at the Paul-Adams property were successful, it would make no business sense for them to close down those operations in 2012, when Mr. Adams had no source of Georgia Gray granite in hand to supply the needs of Star Granite.

Nor can Mr. Adams rely on the subsequent leasing and then purchase of the Sterling Gray Quarry for his claim that his granite needs were fully met. As of the end of 2012, the Sterling Gray Quarry was in the hands of the McLanahan family; John Sr. was alive; and Mr. Adams had no way of knowing that the McLanahan family would wish to lease or sell the Sterling Gray Quarry. John Jr. did not contact Mr. Adams and his son until December 2013, a full year after Mr. Adams and Mr. Paul had already made the decision to stop quarrying at the Paul-Adams property.

Likewise, we do not credit Mr. Adams's proffered explanation that he did not rely on the Paul-Adams property to meet the demands for Star Granite because getting the production up to speed would take too long. As of 2012, Mr. Adams had no inkling that the Sterling Gray Quarry would become available for him to lease or acquire. Thus, it is unclear why Mr. Adams would give up the proverbial bird in hand (and an excellent bird at that, according to his testimony) for some potential but unidentified birds in the bush.

His proffered explanation is in further tension with his testimony that the granite in the Paul-Adams property was of such high quality and so plentiful for dimension work that he could put ten quarries there. He also testified that, based on his own air drilling tests, he could place a quarry virtually anywhere on the property, including the southern portion. If the property (which was larger than the Sterling Gray Quarry) was big enough and granite rich enough to support ten quarries virtually anywhere, one would have expected Mr. Adams and Mr. Paul

[*47] to have developed it to meet Mr. Adams's known needs at Star Granite. That they did not speaks loudly to the unsuitability of the Paul-Adams property as an operating dimension quarry, especially in the reasonably near future. Hypothetical willing buyers would not close their eyes to these realities.

Mr. Adams's testimony that his air-rotary drilling of the property showed that good stone existed throughout the property, including the southern portion, also runs counter to that of Dr. Schroeder, petitioner's own expert in geology. Dr. Schroeder found that the southern portion of the property contained schist, not granite. Perhaps the inconsistency may be explained by the less precise nature of air-rotary drilling.[25] But if that is so, then the air-rotary drilling Mr. Adams undertook tells us (and hypothetical willing buyers) precious little about what we (and they) need to know to reach a decision on the value of property, seriously diminishing any probative value of Mr. Adams's testimony.

Finally, the amount of the losses incurred—nearly $360,000— seems to us inconsistent with a simple exploratory effort. One of petitioner's experts, Mr. Fletcher, claimed that the development and capital cost of establishing a fully operational quarry was just around $520,000 incurred over a three-year period. The losses incurred by Paul-Adams represent nearly 70% of that total. Why experienced people would simply close up shop in those circumstances is unexplained. This is particularly puzzling when they tell us similar costs would need to be incurred all over again if operations resumed in the future.

ii. *Implausible Economic Analysis by Petitioner's Experts*

We consider next the utterly implausible economic analyses offered by petitioner's experts Mr. Fletcher and Mr. Proctor. Even though actual quarrying operations at the Paul-Adams property

---

[25] As we have explained before, "air-rotary drilling causes small chips of subsurface material to be blown up and out of the drill hole, enabling the chips to be collected for examination. Air-rotary drilling is considered preliminary, because the chips collected are not necessarily representative of the subsurface material because of the potential for sample mixing and contamination." *Ranch Springs*, 164 T.C., slip op. at 11–12.

By contrast, "diamond core drilling" (the type of drilling undertaken by Premier Drilling) "is a more reliable (and expensive) exploratory technique. It enables the exploration team to recover a solid cylinder of subsurface material from the top to the bottom of the drillhole." *Id.* at 12.

**[\*48]** resulted in losses in 2010, 2011, and 2012, both experts concluded that a quarry on the property would be wildly successful.

Both experts assumed that the market could absorb the dimension stone extracted at the newly opened hypothetical quarry and that the new quarry would capture significant market share in practically no time. They further assumed that the new quarry would run at a level of efficiency achieved at the best quarries in the area, would quarry high-quality granite, and would have no trouble finding a qualified work force even though labor constraints have been a constant source of problems for other quarriers in the area. We do not share the experts' enthusiasm and, making factual determinations, consider their analyses unrealistic, unreliable, and unhelpful. We catalog here only a few of the many failings of petitioner's experts, which hypothetical willing buyers would not have ignored.

a) *Unrealistic Sale Volumes and Market Share Forecasts*

We start with Mr. Fletcher's and Mr. Proctor's assertions that a quarry on the property would swiftly capture large portions of the market for dimension stone. It is well established that, "[w]here a proffered highest and best use is extraction of some sort of mineral, the landowner must show not only the presence of the mineral in commercially exploitable amounts, but also that a market exists for the mineral that would justify its extraction in the reasonably foreseeable future." *69.1 Acres of Land*, 942 F.2d at 292 (first citing *United States v. Whitehurst*, 337 F.2d 765, 771–72 (4th Cir. 1964); and then citing *St. Genevieve Gas Co. v. TVA*, 747 F.2d 1411, 1413 n.4 (11th Cir. 1984)); *see also Whitehurst*, 337 F.2d at 771–72 ("[L]and having a sand or gravel content may not be valued on the basis of conjectural future demand for it. There must be some objective support for the future demand, including volume and duration. Mere physical adaptability to a use does not establish a market." (Footnote omitted.)); *Green Valley Invs., LLC v. Commissioner*, T.C. Memo. 2025-15, at \*22–23.

This rule applies in the Eleventh Circuit. *See Cameron Dev. Co. v. United States*, 145 F.2d 209, 210 (5th Cir. 1944) ("The mere physical adaptability of the property to use as a source of supply of shell marl, in the absence of a market for its commercial production, did not effect an increase in its market value."); *see also St. Joe Paper Co. v. United States*, 155 F.2d 93, 97 (5th Cir. 1946) ("[B]efore the owner of the condemned land could show adaptability to a use he must show a market

**[*49]** existed or was reasonably likely to exist in the near future." (citing *Cameron Dev. Co.*, 145 F.2d 209)).

The USGS collects and reports, among other things, data about the production of stone in the United States. A USGS Minerals Yearbook for 2015 reported that producers in Georgia produced 140,000 metric tons of dimension stone granite that year. The 2017 Minerals Yearbook, which was released in 2020 before Mr. Proctor drafted his report, reported that Georgia produced 128,000 metric tons of dimension stone granite in 2016 and 121,000 metric tons in 2017. Put simply, according to the USGS, production in Georgia declined between 2015 and 2017.

To maintain unit consistency, we convert those measurements from metric tons of granite into cubic feet in the table below.[26]

| *Production of Dimension Stone Granite in Georgia According to USGS* | | |
|---|---|---|
| *Year* | *In Metric Tons* | *In Cubic Feet* |
| 2015 | 140,000 | 1,871,800 |
| 2016 | 128,000 | 1,711,360 |
| 2017 | 121,000 | 1,617,770 |

Mr. Fletcher and Mr. Proctor were aware of the USGS reports that had been published at the times of their appraisals. Mr. Fletcher provided the 2015 production statistic in his report. Mr. Proctor included the 2016 and 2017 numbers in his Table 8–1, and helpfully (albeit inaccurately) converted them into cubic feet in his Table 8–2.

But Mr. Fletcher and Mr. Proctor assumed that their theoretical quarries would produce granite volumes out of proportion to these statewide volumes. Mr. Fletcher assumed that the quarry would produce 187,500 cubic feet of salable product as early as year 2 and wrote that "[b]ased on the Schroeder projections a stabilized salable

---

[26] One metric ton contains 1,000 kilograms. And a kilogram weighs approximately 2.206 pounds. One metric ton, then, weighs approximately 2,206 pounds. According to Dr. Schroeder's Geology Report, one cubic foot of granite contains approximately 165 pounds of granite. Thus, dividing by 165 pounds, one metric ton of granite occupies approximately 13.37 cubic feet.

**[*50]** product is estimated to be approximately 262,500 cubic feet." Ex. 403-P, p. 32. Mr. Fletcher projected that the quarry would reach this stabilized level of production by year 10. Mr. Proctor, for his part, assumed that a theoretical quarry could produce 358,400 salable cubic feet of granite by its fourth year of operation. By choosing such substantial production numbers, Mr. Fletcher and Mr. Proctor implicitly concluded that a quarry on the Paul-Adams property could seize substantial market share in its early of years of operation, even exceeding 20% of the statewide market.

| Projections of Salable Granite Volume from a Hypothetical Quarry at the Paul-Adams Property, as Percentage of Statewide Production | | | |
|---|---|---|---|
| Year | Georgia Production (according to USGS) | Mr. Fletcher | Mr. Proctor |
| 2015 | 1,871,800 | 10% (187,500[27] / 1,871,800) | 19% (358,400[28] / 1,871,800) |
| 2016 | 1,711,360 | 11% (187,500 / 1,711,360) | 21% (358,400 / 1,711,360) |
| 2017 | 1,617,770 | 12% (187,500 / 1,617,770) | 22% (358,400 / 1,617,700) |

It defies credibility that a new operation in the Georgia granite industry would seize one-fifth of the statewide dimension stone market in just a few years. This is especially so given the market descriptions that Mr. Fletcher and Mr. Proctor relied upon. In particular, Dr. Schroeder's Geology Report acknowledged that granite dimension stone prices were depressed, writing that "[a]ll quarriers would like to raise their prices, but it has been difficult to do because of market conditions." Ex. 402-P, pp. 29–30. The same Report, discussing an interview with a quarry operator, notes demand as a limiting factor: "Production could be increased, but the amount they have orders for limits their yield." Ex. 402-P, p. 34. It is difficult to accept that a new market entrant operating an undifferentiated quarry could seize 10% to

---

[27] Mr. Fletcher assumed the hypothetical quarry at the Paul-Adams property would produce 187,500 cubic feet of salable dimension stone by its second year of operation, so by 2019.

[28] Mr. Proctor assumed the hypothetical quarry at the Paul-Adams property would produce 358,400 cubic feet of salable dimension stone by its fourth year of operation, so by 2021.

**[\*51]** 20% of market share with little to no excess demand and limited room for price competition.

And one would expect existing granite operations to respond to a fast-growing competitor. Even Mr. Adams admitted during trial that, should a new entrant find early success in the granite market, he might respond by selling more of the granite produced in his other quarry so as not to allow the competition a benefit. And if a new entrant were to compete on price and sell only to competitors of Mr. Adams's fabrication operations (and those of Mr. Paul's family), those competitors might be able to lower their prices to their ultimate customers, pressuring Mr. Adams's (and Mr. Paul's family's) fabrication businesses. One would expect Mr. Adams and Mr. Paul's family (as well as other existing producers) to fight back, rather than to sit passively in view of this competition. *See Jackson Stone South, LLC v. Commissioner*, T.C. Memo. 2025-96, at \*125 ("We do not think that it is reasonable to assume that Vulcan and Martin Marietta, which are both large publicly traded companies, would simply cede their local market sales to an upstart mine rather than lower their prices to compete and retain market share."); *see also, e.g.*, *Whitehurst*, 337 F.2d at 774 (evaluating demand for materials from a borrow pit[29] by "having in mind the competition from other pits and other material sources," including an existing pit owned by the same landowner on land which was not taken "which would compete with the land taken").

It is no answer to point to Williams Stone (as petitioner does), which entered the Georgia quarrying industry after developing in the New England granite industry and succeeded at operating two existing quarries. That business entered Georgia with an established fabrication plant and access to the New England market. No credible evidence suggests that an operation on the Paul-Adams property would have shared those attributes in December 2017.

Also, pursuing price competition as a strategy for capturing market share would, at least in the short-term, reduce the projected revenues of Mr. Fletcher's and Mr. Proctor's theoretical quarries. Each of their models assumes fixed starting sale prices that increase by some small percentage annually. To beat out established operations,

---

[29] A borrow pit is "an area where material (usually soil, gravel or sand) is dug for use at another location. The term is literal—meaning a pit from where material is borrowed." *J L Mins.*, T.C. Memo. 2024-93, at \*35 n.14 (quoting *Mactec, Inc. v. Bechtel Jacobs Co., LLC*, 346 F. App'x 59, 69 (6th Cir. 2009)).

**[\*52]** however, a new quarry might have to reduce its prices for some number of years, sacrificing revenue in those years in exchange for production growth. In other words, competition reduces profit. A nascent quarry would not command high, fixed prices while beating out other producers absent some other indicia of differentiation, such as extremely high-quality stone or technological advancement.

Petitioner's efforts to cast aspersions on the quality of the data of the USGS Mineral Yearbooks are unpersuasive.[30] Those reports are widely relied upon by industry members. Even petitioner's own experts used USGS data to develop estimates in their reports. And, even if the Mineral Yearbooks were found to understate production levels by a substantial degree—even 100%—the production values assumed by Mr. Fletcher and Mr. Proctor would remain incredible.

As the analysis above shows, the volume forecasts petitioner's experts proffered are inconsistent with general market data and economic theory. Hypothetical willing buyers would not ignore the obvious points highlighted above.

But we need not rely only on general market data and economic theory to set aside the volume forecasts petitioner's experts offered. Mr. Adams's own experience at the Sterling Gray Quarry provides one of the strongest indications that Mr. Fletcher's and Mr. Proctor's projections were a work of fiction.

Recall that Mr. Adams began leasing the Sterling Gray Quarry in 2014. Recall further that under the lease he was required to pay $1 per cubic foot of most of the granite quarried[31] and that any royalties paid would reduce the price paid to exercise the purchase option. When the

---

[30] For example, petitioner points to Mr. Rice's testimony in *Beaverdam*. In that case, Mr. Rice said that his quarry produced 700,000 to 800,000 cubic feet of curbing stone per year. He further testified that his quarry had $16.5 to $17 million in annual revenue. These numbers would suggest a price between $21 and $24 per cubic foot. This is far in excess of any price for curbing stone we have been given by any expert in this case, even for later years after prices for curbing stone increased. So Mr. Rice's numbers do not add up. Additionally, Mr. Rice's testimony related to later years when, again, the market demand and pricing for curbing had increased. We therefore do not credit Mr. Rice's testimony that the figures he provided apply to 2017.

[31] For curbing granite, the royalty rate was 33 cents per cubic foot, but Mr. Adams testified that the Sterling Gray Quarry did not have much curbing stone, and records for subsequent years confirm this assertion. Therefore, royalties on curbing granite do not have a material impact on our analysis, and we will not discuss them further.

**[*53]** option was exercised in 2019, Mr. Adams paid $1,172,367 for the 159 acres covered by the option. This means that he paid about $227,633 in royalties between 2014 and 2019 ($1.4 million contract option price less $1,172,367 actually paid implies $227,633 was paid in royalties).

The record does not contain production information for the Sterling Gray Quarry between 2014 and 2018. The first year for which production data is in the record is 2019. But we can draw some reasonable inferences from the data that we have.

First, Mr. Adams testified that it took between one and two years to start up operations at the Sterling Gray Quarry. During any period for which there was no production, Mr. Adams would have been required to pay the minimum royalty of $36,000 per year, rather than the volume-based royalty. Assuming (in petitioner's favor) that operations took only one year to start up, of the $227,633 royalty payment, $191,633 represented royalties based on volume ($227,633 in total royalties for 2014 through 2018 less $36,000 in minimum royalties for 2014). That means that between January 2015 and December 2018, the Sterling Gray Quarry would have produced a total of approximately 191,633 cubic feet of granite. That translates into an average of 47,908 cubic feet of granite for each of those four years (191,633 / 4 = 47,908.25).

This estimate is not unreasonable in view of the production information we do have. In 2019, the Sterling Gray Quarry produced 67,468 cubic feet of granite (of which only 297 cubic feet, or less than half a percent, was curbing). The following year production rose to 77,427 cubic feet. And the year after to 106,915 cubic feet.

Recall that, with respect to Georgia Gray, these amounts were sufficient to satisfy all the requirements of Star Granite, one of the largest fabrication operations in the area. Then compare these numbers with the sales volumes Mr. Fletcher and Mr. Proctor included in their models.

| [*54] *Year* | *Actual Production in Cubic Feet at Sterling Gray Quarry* | *Mr. Fletcher's Projected Production in Cubic Feet at Paul-Adams Property* | *Mr. Proctor's Projected Production in Cubic Feet at Paul-Adams Property* |
|---|---|---|---|
| 2019 | 67,468 | 187,500 | 179,200 |
| 2020 | 77,427 | 187,500 | 268,800 |
| 2021 | 106,915 | 187,500 | 358,400 |
| 2022 | 164,112 | 187,500 | 358,400 |
| 2023 | 171,726 | 225,000 | 358,400 |

How a newly opened Paul-Adams quarry would produce that much granite and where it would sell this type of volume are unexplained.[32] Throughout the trial, petitioner's counsel repeatedly asked witnesses whether outsiders to the Elberton market or people with 80 to 100 years of experience in that market were better suited to make market predictions about Georgia Gray granite. And the witnesses dutifully responded that people with market experience were more likely to know what market demand might be.

Those answers make sense in the ordinary case in which an appraiser is asked to use, in a valuation prepared for litigation, sales projections independently prepared for business purposes before the litigation arose. Such projections generally have credibility because they have not been developed for litigation and because business

---

[32] Petitioner attempts to justify his expert's estimates of higher production, reduced costs, and greater margins in part by arguing that the quarry on the Paul-Adams property would be a drive-in quarry rather than a pit quarry. (Once established, drive-in quarries typically are more efficient than pit quarries because no crane is required.) But as Mr. Proctor helpfully explained: "Drive-in quarries . . . are developed by cutting laterally into hillsides, allowing for more accessible and streamlined extraction processes." Ex. 401-P, p. 40. Petitioner has presented no evidence of a suitable hillside on the Paul-Adams property. And notably, when Mr. Adams and Mr. Paul quarried the property, they opted to expand the existing pit rather than developing a drive-in quarry. Mr. Adams candidly testified that the existing pit was not big enough for a drive-in quarry and that converting it to a drive-in quarry would have cost approximately $1 million because granite would need to be moved and multiple switchbacks would need to be cut. Tr. 1136–38.

**[\*55]** decisions turn on them. For example, when a business must hire extra people and acquire additional supplies to produce inventory in anticipation of projected sales, the business has every incentive to get the projections as close to right as it can. Otherwise, a projection error would result in unnecessary losses if the projected sales were to fail to materialize. Hypothetical willing buyers would be keenly aware of these stubborn economic facts.

Circumstances are remarkably different when projections are not constrained by business realities. A businessman projecting how much dimension stone can be produced and sold in a given year by a hypothetical quarry that will never be built has no outside forces tempering his optimism. Rosy projections do not hurt his bottom line. He will not have sunk costs that might never be recovered or unsold inventory to write down (a luxury hypothetical willing buyers would not enjoy). Indeed, in a case like this one, where higher projected sales result in higher charitable contribution amounts, rosy projections simply serve to increase the potential benefits flowing from the fisc in the form of reduced income tax liabilities.

To the extent Mr. Adams and Mr. Paul provided the projections used by petitioner's experts, those projections were rosy indeed, as the table above illustrates. Mr. Adams's recollection also seems to have been clouded about the actual performance of the Sterling Gray Quarry as of 2017. When Mr. Adams was called for rebuttal, the Court asked him about the volume of granite produced at that quarry in 2017. In what appeared to be an effort to support the valuation conclusions of his experts, Mr. Adams responded that the quarry was probably producing "over 100,000 cubic feet, maybe 120 [or] 125,000 cubes in '17." Tr. 1994.

But, as the table above shows, the Sterling Gray Quarry did not break the 100,000 cubic feet barrier until 2021, several years after 2017. And even in 2019 (two years after the date relevant here and five years after Mr. Adams began leasing the property), the Sterling Gray Quarry was producing only 67,468 cubic feet of granite. If the quarry supplying Star Granite sold only that much granite in 2019, it beggars belief that there was plentiful market demand for a brand new quarry to provide between 179,200 and 187,500 cubic feet to some unidentified, unaffiliated operations in 2019 alone or to provide more than 358,000 cubic feet two years later (as reflected in the projections of one of petitioner's experts).

[*56] In a similar vein, one more objective data point undercuts the rosy projections for the Paul-Adams property. As we have discussed, in February 2018, one of Mr. Adams's companies entered into a supply agreement with Matthews, the publicly traded company that acquired some of Mr. Adams's fabrication operations. Under the supply agreement, Mr. Adams's company agreed "to produce and make available for sale to Matthews" at least 80,000 cubic feet of granite from the Sterling Gray Quarry at specified prices. The agreement referred to this amount together with a specified amount of granite produced by the Pink Pearl Quarry as the "Minimum Amounts."

Matthews was obligated to purchase the Minimum Amounts from Mr. Adams's company. Given this condition in the supply agreement, one would expect Sterling Gray Quarry's sales for 2019 to be at least 80,000 cubic feet. But Matthews's obligation to purchase was subject to at least two exceptions. Matthews was free to buy fewer than 80,000 cubic feet if it could establish either (1) that its annual granite needs had decreased as a result of a lack of demand generated by consumer orders or (2) that Matthews's annual purchase orders remained at or above the granite supply needs of the business Matthews acquired from Mr. Adams in February 2018. Given the amount of granite the Sterling Gray Quarry actually sold in 2019 (67,468 cubic feet), one might reasonably conclude that Matthews's failure to buy 80,000 cubic feet of granite for that year may have been justified by the fact that its orders remained at or above the level of where production had been as of February 2018 (i.e., before the acquisition). Of course, it could also be that lack of customer demand resulted in the lower sales in 2019, but, either way, the actual results under the supply agreement do not bode well for Mr. Fletcher's and Mr. Proctor's rosy projections.

In short, in view of the foregoing, we conclude that petitioner has failed to establish "the existence of a market 'that would justify [the] extraction [of the granite dimension stone found in the Paul-Adams property] in the reasonably foreseeable future.'" *Esgar Corp. v. Commissioner*, 2012 WL 371809, at *8 (quoting *69.1 Acres of Land*, 942 F.2d at 292); *see also, e.g.*, *Cameron Dev. Co.*, 145 F.2d at 209–10 (holding that evidence about the existence of shell marl on the property was properly excluded when "[n]o evidence was offered to prove that any market existed, or was reasonably likely to exist in the near future, at which this shell could be profitably sold," and when "[n]o showing was made that any purchaser was willing to pay any more for the land, because of the shell deposits, than its market value as pasture land"); *Ranch Springs*, 164 T.C., slip op. at 47–48 (finding that limestone

[*57] mining was not a property's highest and best use where existing suppliers could meet new demand); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *35–37 (same with respect to gravel mining).

### b) *Unrealistic Quarry Efficiency*

Next, we consider the efficiency of the theoretical quarries proposed by Mr. Fletcher and Mr. Proctor. Here, as with production volume, petitioner's valuation experts stretch credibility beyond its breaking point. Efficiency, in this context, refers to how much of the granite mined from beneath the property can be sold to actual customers.

Dr. Schroeder provided some insight into quarry efficiency in his discussion of the dimension stone market, noting that "[p]ercentages of usable stone can vary from as low as 5 or 10% to as high as 80 or 90%, but in the better quarries (those that are operating) it probably averages at least 50% usable." Ex. 402-P, p. 30. In other words, while efficiencies can vary widely, quarries that survive usually retain at least half of what they mine. This description pairs well with analysis from Mr. Gunesch, one of the Commissioner's experts, who concluded that, under Mr. Proctor's model, a recovery rate of at least 48% was necessary for a theoretical quarry to break even.

Mr. Fletcher and Mr. Proctor assumed that their modeled quarry operations would retain 75% and 80%, respectively, of their mined granite. These assumptions fall at the high end of the range provided by Dr. Schroeder. Moreover, they were determined with little to no analytical support. It is challenging to accept, on its face, that any quarry operation begun on the Paul-Adams property would reach such high efficiency.

Multiple witnesses who testified in the Court's recent *Beaverdam* case, which also dealt with granite quarrying operations in the Elberton Granite area and on which some of petitioner's experts relied, stated that their operations recovered 80% of the granite mined for sale. The lowest estimate was 49%–50% in one quarry's first year. But it would not do to rely on that testimony to establish an 80% expected recovery rate for a quarry on the Paul-Adams property. The witnesses who testified in *Beaverdam* about the efficiency of their ongoing quarries had developed successful quarries—something that is not guaranteed to a theoretical quarry on the Paul-Adams property and to hypothetical willing buyers of that property. In other words, survivorship bias

**[\*58]** colored such testimony. And no former operators of failed quarries were called to testify.

Without such additional evidence, there is no reliable support for the claim that a quarry on the Paul-Adams property would recover 80% of its mined granite. There is not even support for a 50% recovery rate—and to assume a recovery rate reserved for "successful" quarries would be to discharge the financial feasibility aspect of the highest and best use analysis on no evidence at all.

Nor is this a theoretical concern. As James Michael Rutherford, a witness who also quarried granite in the area and was called by petitioner, explained, quarries have failed in Elberton. He put the number of failed quarries at 8 to 10 (out of 50 or so).

c)      *Unproven Quality of Granite*

Furthermore, petitioner's experts have not credibly demonstrated the amount of granite beneath the Paul-Adams property that is of a quality suitable for the dimension stone market. Not all granite can be sold as dimension stone. Only granite of consistent color, with few or no veins or streaks, and granite that can be mined in large, whole blocks can be sold as dimension stone.

Mr. Fletcher and Mr. Proctor each assumed that the granite beneath the Paul-Adams property was suitable for dimension stone use. Discussing the highest and best use of the property, Mr. Fletcher wrote that "it would be reasonable to assume that mineral extraction, specifically either dimension stone or aggregate stone production could be a financially feasible use of the Paul-Adams Quarry Trust, LLC property."[33] Ex. 403-P, p. 28. And Mr. Proctor noted that "Burgex was asked to assume that the Property would be used for the extraction and sale of dimension stone granite." Ex. 401-P, p. 14.

But Dr. Schroeder, upon whose Geology Report Mr. Fletcher and Mr. Proctor each relied, made no determination in 2017 that the Paul-Adams property contained natural resources suitable for the dimension stone market. His volumetric estimates applied only to the amount of aggregate resource available beneath the property. And, although he noted that "this property could potentially be developed as an aggregate

---

[33] Petitioner has now retreated from pressing aggregate stone production as the highest and best use of the property. So we need not pursue that possibility further.

[*59] quarry or dimension stone quarry[,]" that statement was qualified: It applied only "[w]ith further favorable testing of rock cores from the Adams tract site." Ex. 402-P, p. 40.

Dr. Schroeder amended his conclusion to become more bullish about dimension stone quarrying on the Paul-Adams property, but he did so in May 2025, in anticipation of trial. We are inclined to credit his observations from 2017—developed near the grant of the conservation easement—more readily than conclusions developed eight years later and after reviewing testimony from the 2024 trial in *Beaverdam*.

Nor did Mr. Black, Paul-Adams's second geological expert, perform analyses essential to determining the suitability of the property's granite for sale as dimension stone. Mr. Black did conclude that "the bedrock at the Site is suitable for use as dimension stone as well as coarse aggregates." Ex. 400-P, p. 22. And Mr. Black tested and closely examined the compressive strength and tensile strength of the granite beneath the Paul-Adams property. But he did not consider the color of the granite or its color consistency, nor whether it contained streaks or veins of other minerals. Nor was he able to make determinations regarding the entire property's granite deposit. Indeed, his analysis assumed "geological and quality continuity between points of observation (rock borings and outcrops)." Ex. 400-P, p. 23. Here, there were only three boreholes, which were spaced far from each other, on a more than 200-acre property. Accordingly, it is quite possible that the granite between observation points deviates from the characteristics expected of dimension stone. As Mr. Adams himself testified, core drilling shows only the stone in a two-and-a-half-inch hole; it does not show what is five feet away in any direction. Tr. 1272. And Mr. Rutherford confirmed that you cannot determine the stone's grade until you begin quarrying it.

Other analyses offered to the Court cut against the conclusion that the granite beneath the property would qualify for the high grades in the dimension stone market. Mr. Gunesch analyzed the color composition of samples taken from the property, noting that "[c]olor changes or fractures within the granite preclude using blocks as dimension stone if the color changes or fractures . . . prevent extracting solid quarry blocks of consistent color." Ex. 601-R, p. 67. He developed a metric to count the percentage of each core sample that could be removed as a color-consistent gray block. The sample for borehole 1 was 95% color consistent. From borehole 2, 17%. And borehole 3 produced a 29% color-consistent sample. In short, the potential for extracting

**[\*60]** blocks of consistent gray color—blocks that could be sold as dimension stone—varied significantly across the northern portion of the property.

Mr. Gunesch also noted that blocks surrounding the abandoned quarry on the Paul-Adams property showed signs of contact with gneiss. If those blocks were taken from the very bottom of the abandoned quarry, he concluded, the granite on the Paul-Adams property there might become unusable gneiss at a depth of approximately 40 feet. Because gneiss cannot be sold as dimension stone, such a transition would severely curb the volume of dimension stone that could be mined from the property. Notably, in test drilling, gneiss also appeared in borehole 2. And, even more notably, someone instructed Mr. Towe to stop drilling at 35 feet for borehole 3, the borehole next to the quarry, even though Premier Drilling's normal practice would be to drill to 100 feet, as Mr. Towe did for holes 1 and 2. No one has claimed responsibility for this decision or adequately explained it, suggesting that perhaps drilling was stopped at 35 feet because Mr. Adams or Mr. Walstad knew they would find gneiss at greater depths.[34]

Petitioner also called Steven Scott Gunter. Mr. Gunter works in the granite business in Elberton. He recalled that in 2010 to 2012 his business focused on coping stock (recall that coping stock is the fourth grade of dimension stone, lower than die, base, and quarry run, but higher than curbing). He remembered buying between 50 and 100 blocks of coping stock from the Paul-Adams property and paying between $600 and $800 per block. A block of coping stock generally measures 10 feet by 4 feet by 3 feet. Although Mr. Gunter recalled seeing some blocks of other grades at the property when he picked up his coping stock, he provided no testimony of the volume of that stone.

Mr. Adams and Mr. Paul both testified at various points about selling the stone they pulled out of the Paul-Adams property. Mr. Paul said that they sold approximately 70% to 80% of what they recovered, which, in his words was "[g]ood for a surface quarry." Tr. 203. Mr. Adams testified that they sold 90% to 95% of what they quarried,

---

[34] Petitioner argues that drilling was stopped because drilling to 35 feet confirmed consistency with the rock from the existing quarry. But this makes little sense. If Paul-Adams was trying seriously to assess the quality of the rock on the property, why would it place a borehole close to the existing quarry without drilling any deeper? That choice would seem to provide little information Paul-Adams did not already possess, whereas drilling deeper would have provided new information.

[*61] and then later testified that "we sold every bit of it."[35]  Tr. 1139. But that testimony is at odds with the significant number of discarded blocks on the property, including around the quarry and in the waste pile on the southern end of the property.

Mr. Adams initially alleged that all the "blocks around the hole [were] from the original . . . guy that opened it up" and that "really all of those could have been sold for curbing." Tr. 1144–45.  But Mr. Paul said that he and Mr. Adams had dumped waste, which he said was about 25% of what they pulled out, right around the quarry itself.  Tr. 246. And both men acknowledged that the waste pile on the southern portion of the property was made up of stone from the Paul-Adams property, which, in Mr. Sheppard's opinion, appeared to contain a significant percentage of the total granite pulled.  Mr. Sheppard noted that "[a]ll evidence seems to point to the material extracted from the test pit being of a poorer quality and thus discarded."[36]  Ex. 600-R, p. 47.

Petitioner called no other purchasers of dimension stone quarried at the Paul-Adams property in 2011 and 2012.  Aside from Mr. Adams's and Mr. Paul's testimony, we have no basis to conclude how much stone was quarried or what type.  And, as Mr. Rutherford explained, the type of stone that can be quarried makes or breaks a business.  Sixty-five percent of the stone his quarry produced was die, and his success in that quarry was attributable to quarrying that type of stone.  According to Mr. Rutherford, quarry operators with lower levels of high-quality stone could not be expected to make much money.

### d)    *Unrealistic Projected Prices*

Even if the quality of the stone beneath the Paul-Adams property, the efficiency of a potential mining operation, and the production volume

---

[35] Note that Mr. Adams so testified in response to an inquiry regarding the Sterling Gray Quarry, but the context and content of the testimony made it clear that he misunderstood the question and was referring to the Paul-Adams property, which he had been discussing in response to the previous question.  For example, Mr. Adams stated that "we've done [quarrying] very little" and "we had quite a bit of coping." Tr. 1139.  Both statements accurately describe the Paul-Adams property and do not describe Mr. Adams's discussions of Sterling Gray.  Additionally, in response to the next question, Mr. Adams said "Oh, the Sterling Gray Quarry?" reflecting his understanding that he had been speaking about the Paul-Adams property.

[36] Mr. Sheppard explained that the market for lower quality curbing stone did not develop until approximately 2021.  Other experts noted a market change around this time as well.

[*62] achievable at such an operation had been presented with sufficient credibility, petitioner and his experts further failed to credibly estimate the price the granite leaving the Paul-Adams property would obtain.

Mr. Fletcher chose a price of $13.10 per cubic foot for his modeled quarry. He purportedly drew that value from Dr. Schroeder's Geology Report. But Dr. Schroeder represented only that *aggregate stone* could be sold for $13.10 *per metric ton*. Thus, there are two significant problems here. First, Dr. Schroeder's $13.10 figure was not a price estimate for dimension stone. And, although Dr. Schroeder provided in his report a table of average prices for different grades of dimension stone in Elberton, neither his $13.10 aggregate price nor Mr. Fletcher's $13.10 dimension stone price appears to be based on that table.

Second, as noted above, Dr. Schroeder reported his price for aggregate in dollars per metric ton. Converted to dollars *per cubic foot*— the unit used by Mr. Fletcher—Dr. Schroeder's price is roughly $0.98 per cubic foot.[37] This makes sense, given that aggregate stone does not face the same quality restrictions as dimension stone. By drawing his price from Dr. Schroeder's report, Mr. Fletcher chose a wholly unsubstantiated average price for dimension stone for his modeled quarry.

Mr. Proctor displayed more sophistication in setting his prices. He examined witness pricing statements from the *Beaverdam* litigation and presented a table of price statements separated by stone grade. Then, he chose a price for each grade from the ranges available to him. He also assumed that his modeled operation would produce a set mix of stone of different grades: 10% die, 20% quarry run, 30% base, 10% coping, and 30% curbing.

Mr. Gunesch compared Mr. Proctor's prices to those published and realized by the Greene County Quarry and Blue Ridge Quarry from 2017 through 2024. As it turns out, the realized prices at those real quarries were, on average, 12% lower than Mr. Proctor's, and their published prices 14% lower. Perhaps some quarries can command higher prices than their competitors, but it is difficult to believe that a new entrant to the quarrying market would be able to set significantly

---

[37] As noted above, *see supra* note 26, one metric ton of granite occupies approximately 13.37 cubic feet. Thus, if a metric ton of aggregate granite sells for $13.10, a cubic foot of aggregate granite would sell for about $0.98 (i.e., $13.10 per metric ton ÷ 13.37 cubic feet in metric ton = $0.98 per cubic foot).

[*63] higher prices than established quarries and compete successfully. *See, e.g.*, *Jackson Stone South, LLC*, T.C. Memo. 2025-96, at *125.

Both Mr. Fletcher and Mr. Proctor also assumed that the price of dimension stone would increase by 3% or 2.5% annually. But there is reason to believe that stone prices were largely static in the years leading to 2017. Dr. Schroeder, for example, reported that "[d]espite inflation, and the rising cost of materials and labor, there has been very little change in these prices in the last twenty-five years."[38] Ex. 402-P, p. 29.

e)  *Unrealistic Labor Assumptions*

The very real labor constraints that real quarry operators have experienced also apparently posed no obstacle to the development and growth of Mr. Fletcher's and Mr. Proctor's theoretical quarry operations. As Mr. Rutherford candidly put it, one of the biggest problems in running his quarry was labor. Finding a reliable crew and keeping them were important. He estimated that it would take between three and six months to train a new employee to be able to work without supervision. And complications in training and supervising employees was one reason he did not expand production. Similarly, while Mr. Adams procured labor to operate Sterling Gray Quarry from around 2015 onward, the initial production and growth at that quarry were much lower than the production and growth petitioner's experts project for the Paul-Adams property. Mr. Fletcher and Mr. Proctor's computations brush such problems aside, assuming that ever-increasing production would be achieved at the Paul-Adams hypothetical quarry.

f)  *Unrealistic Assumptions About Available Granite Deposits*

Finally, there are indications that petitioner's valuation experts claimed much more certainty about the minerals beneath the Paul-Adams property than was due. Multiple experts who testified at trial relied on the SME Guide for 2017, which sets out a system for categorizing the extent of exploration and certainty regarding the mineral content beneath a parcel of real property. As we have already explained, *see supra* Findings of Fact Part III, these categories represent

---

[38] We note that, under the supply agreement between Matthews and Mr. Adams's company, prices for the Minimum Amount could not increase by more than 2% per year during the term of the agreement.

**[\*64]** levels of certainty: As one performs additional investigation and exploration, the uncertainty in their mineral estimates decreases.

To review, the SME Guide sets out two categories of mineral estimating, mineral resources and mineral reserves. Mineral resources reflect the content below ground, while mineral reserves reflect the below-ground mineral content that can be used, considering economic, legal, environmental, and other factors. Within those macrocategories, mineral resources can be inferred, indicated, or measured—increasing in confidence, respectively. Mineral reserves can be probable or proven. And, before one even enters the world of mineral resources and reserves, the "exploration results" category describes the least certain category. *See supra* Findings of Fact Part III.

Mr. Black, Mr. Sheppard, and Mr. Gunesch used these terms to develop and state their conclusions. Mr. Black concluded that an indicated mineral resource existed beneath the Paul-Adams property— that is, that there was a medium level of confidence regarding the presence of granite, but that there was little knowledge of economic viability. Mr. Sheppard came to a different conclusion, writing that "there appears to be an insufficient amount/spacing of core drilling and lab testing, which prevents any geologist from providing more than an inferred resource estimate." Ex. 600-R, p. 50. And Mr. Gunesch reported in two places that, based on the information and analyses available, "the granite cannot be defined as any category of mineral resource for dimension stone, even the lowest category which is an Inferred Mineral Resource." Ex. 601-R, p. 46.

Additionally, Dr. Schroeder, even though he did not use the SME framework as such, commented repeatedly about the need for further testing to confirm the quantity and quality of the granite underlying the Paul-Adams property. At one point, he noted that "[f]or a more accurate estimate of inferred subsurface rock quality, additional deep subsurface drilling program and subsequent rock testing are needed." Ex. 402-P, p. 26. Later, he commented that the property "could potentially be developed" as a quarry "[w]ith further favorable testing of rock cores from the [property]." Ex. 402-P, p. 40. Accordingly, his Geology Report too underlines the inherent uncertainty of a quarrying venture when only limited testing has been performed and confirms that firm conclusions about the Paul-Adams property required additional testing.

All told, although Mr. Black, Mr. Sheppard, and Mr. Gunesch disagree about the level of confidence attributable to the granite beneath

[*65] the Paul-Adams property, none represented that a high-confidence "measured mineral resource" was present. Nor did Dr. Schroeder. Further, none of the four represented that mining was economically viable such that a probable or proven mineral reserve could be estimated. But both Mr. Fletcher and Mr. Proctor paid little heed to the tempered conclusions of the geologists on their own side and went on to assume that the Paul-Adams property contained abundant, quality dimension granite.

We heard testimony throughout the trial that Elberton granite miners do not follow the SME Guide in determining when and where to quarry or estimating how much granite underlies a piece of property. That may be so, but that Guide offers a useful framework for understanding how others, including public companies, perform such assessments. It illustrates how one can move from more to less uncertainty regarding a mineral deposit, and thus from more to less risk, when contemplating a mining operation. Of course, miners in Elberton are not required to perform the kind of testing described in the guidelines to prove a resource or a reserve, but they should not be surprised when increased uncertainty from such an approach produces reduced values for land with merely suspected deposits. Indeed, perhaps this is why, as we will see, parcels in the Elbert granite area, including those with open pits, tend to sell for relatively modest prices, despite the testimony we heard about the high-quality granite deposits underlying the area and the purported limitless demand for finished Georgia Gray products. And, in any event, we do not think hypothetical buyers would disregard the principles reflected in the SME Guide when making their pricing decisions.

In short, in view of the record as a whole, we find that there was not "a reasonable probability the land would be . . . used [as an active granite dimension stone quarry] in the reasonably near future." *Stanley Works*, 87 T.C. at 401; *see Hilborn*, 85 T.C. at 689 ("Any suggested use higher than current use requires both 'closeness in time' and 'reasonable probability.'"). In our view, there is simply "too high a chance that the property will not achieve the proposed use in the near future." *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). Therefore, petitioner's proposed "use is too risky to qualify." *Id.*

Putting the same conclusion "in terms of willingness to pay," we conclude that petitioner's "proposed use [as an active quarry] is too risky for 'a hypothetical willing buyer [to] consider [the use] in deciding how

[*66] much to pay for the property.'" *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000 n.14 (quoting *Whitehouse II*, 615 F.3d at 335). Therefore, petitioner's proposed use cannot "be deemed the highest and best available." *Id.*

d. *The Commissioner's Proposed Highest and Best Use*

The Commissioner maintains that the highest and best use of the property is for potential mining following more extensive drilling/testing, the creation of a mine plan, and completion of a market feasibility study, whether for dimension or aggregate production.

The Commissioner's proposed highest and best use finds support in the existing use of the Paul-Adams property. It also finds support in Dr. Schroeder's Geology Report, as we have just discussed. *See* Ex. 402-P, p. 40 (noting that the property "*could potentially* be developed" as a quarry "*[w]ith further favorable testing*" (emphasis added)). The Commissioner's proposed highest and best use recognizes the inherent value in the granite existing in the Paul-Adams property and its zoning. It also recognizes that a hypothetical willing buyer would likely be willing to pay for the possibility to explore further whether the existing granite deposit could be monetized economically. In addition, the Commissioner's proposed use accounts for the fact that additional work would be needed to determine whether operating an actual quarry on the Paul-Adams property would be economically feasible (perhaps, for example, near borehole 1) and, absent more data, a prospective purchaser would not be willing to pay the existing owner an amount that assumes the granite underlying the property can in fact be profitably quarried as dimension stone.

e. *The Court's Conclusion on Highest and Best Use Before the Easement Was Granted*

To sum up, we find that the highest and best use of the property before the easement was granted is as the Commissioner proposes—for potential mining following more extensive drilling/testing, the creation of a mine plan, and completion of a market feasibility study, whether for dimension or aggregate production.

We pause briefly to describe the difference between our conclusion as to highest and best use and petitioner's proposed use. Petitioner argues that the highest and best use of the property, before the easement, was as an active quarry. As discussed above, the record

**[\*67]** does not support the conclusion that one could profitably operate a quarry on the property in the reasonably near future. *See generally Stanley Works*, 87 T.C. at 401 (citing *Olson*, 292 U.S. at 257).

But neither does the record categorically preclude the conclusion that profitable quarrying might at some point happen at the property. Further exploration of the property, for example by collecting additional core samples at regular intervals near borehole 1, might have revealed the presence of a marketable granite resource. And better market analysis might actually show demand for the granite that could be extracted at the quarry and that such demand might justify the cost of extraction. Moreover, changes in the granite market, such as the one that apparently occurred in 2021, or in the costs of operating a quarry after 2017 might also have changed the financial outlook for quarrying on the property and might need to be taken into account depending on the foreseeability and likelihood of their occurrence, something a hypothetical willing buyer would have to weigh.

Given the possibility that subsequent exploration, additional market analysis, or market developments might indicate quarrying as a viable use for the property, it is reasonable to expect that one might have purchased or leased the property, in 2017, in order to explore or to speculate on market dynamics. But such a hypothetical willing buyer would not pay as though profitable quarrying was an immediate certainty. Instead, one would expect such a buyer to pay a price reflecting the inherent uncertainty the buyer would face and the additional exploratory costs and risks that the buyer would assume.[39]

Our conclusion as to the highest and best use of the property reflects these realities. "Potential mining" represents the possibility that the property might eventually be mined if it is proven that quarrying would produce sufficient volumes of marketable granite that could be sold at high enough prices. It also recognizes the possibility

---

[39] Petitioner argues that, through the expert reports it submitted at trial, it has taken the required steps to reduce uncertainty regarding mineral deposits on the Paul-Adams property. But, as we have discussed at length, we do not find those reports credible. And, even if we did find them credible, they did not exist in 2017. *See, e.g.*, *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir. 1985) ("[T]he property in the decedent's estate is evaluated by determining what a willing buyer would give for it on the date of death. Information that the hypothetical willing buyer could not have known is obviously irrelevant to this calculation."). Reducing uncertainty later (which, again, petitioner has not done) does not change the uncertainty that existed when the easement was granted. And it is that earlier uncertainty that is relevant to determining fair market value as of the easement date.

[*68] that someone interested in entering the granite market might purchase or lease the property, factoring the risk of failure into their willingness to pay.

### 3. *Highest and Best Use of the Property After the Easement Was Granted*

Petitioner and the Commissioner generally agree that the highest and best use of the Paul-Adams property subject to the easement is for passive use and recreation. The minor differences in how they describe this proposed use do not affect our value determination, and so we do not discuss them further.

### C. *Valuation of the Paul-Adams Property Before the Easement Was Granted*

### 1. *Legal Principles*

Having determined the highest and best use of the property, we next turn to determining its value before the grant of the easement.

We typically draw on one or more of three common approaches to determine the fair market value of a piece of real property: (1) the market, or comparable sales, approach; (2) the income approach; and (3) the cost, or an asset-based, approach. *See, e.g.*, *Ranch Springs*, 164 T.C., slip op. at 40; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can vary based on the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at *31–32; *Savannah Shoals*, T.C. Memo. 2024-35, at *35–36.

In addition, and unsurprisingly, "[t]his Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." *Buckelew Farm*, T.C. Memo. 2024-52, at *56; *see also J L Mins.*, T.C. Memo. 2024-93, at *55; *Corning Place*, T.C. Memo. 2024-72, at *28; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *31 ("The best evidence of a property's [fair market value] is the price at which it changed hands in an arm's-length transaction reasonably

**[\*69]** close in time to the valuation date."); *ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at \*14.

The various approaches and the value indicated by previous sales provide a valuable sanity check for each other. *See Ranch Springs*, 164 T.C., slip op. at 40; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*32.

## 2. *Comparable Sales Approach*

The comparable sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals*, T.C. Memo. 2024-35, at \*36; *accord Ranch Springs*, 164 T.C., slip op. at 48. This method is usually the most reliable indicator of value when sufficient information exists about sales of properties resembling the subject property. *See United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value."); *see also Mountain Valley Pipeline, LLC v. 9.89 Acres of Land*, 127 F.4th 437, 441 (4th Cir. 2025) ("Comparable sales are generally accepted as the best evidence of property value." (citing *United States v. 269 Acres of Land*, 995 F.3d 152, 164 (4th Cir. 2021))); *L.E. Cooke Co.*, 991 F.2d at 342 ("In land condemnation proceedings, the comparable sales method of valuation is the preferred approach of establishing the fair market value of property."); *First Nat'l Bank of Kenosha*, 763 F.2d at 896 ("Generally, evidence of sales of comparable property is persuasive evidence of market value, either as direct proof or in support of an expert's opinion." (quoting *United States v. 1,129.75 Acres of Land*, 473 F.2d 996, 998 (8th Cir. 1973))); *Whitehouse III*, 139 T.C. at 324–25 (stating that other valuation methodologies are "not favored if comparable-sales data are available").

"The comparable sales method is based on the 'principle of substitution.'" *Ranch Springs*, 164 T.C., slip op. at 48. That principle stands for the proposition that "the value of a property can be estimated at the cost of acquiring an equally desirable substitute." *Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at \*51; *see also Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at \*7 (declining to disturb the Tax Court's conclusion that "there is little reason to think a willing buyer would have paid $32,600 per acre for the Property [at issue]. After all, a buyer could simply purchase substitute properties for exponentially less: per-acre prices ranging from $1,602 to $4,971."); *Buckelew Farm*, T.C. Memo. 2024-52, at \*50 n.25, \*55 ("[T]he principle of substitution . . . stands for the proposition that a hypothetical buyer will not pay more

[*70] for a given property when an alternative property is available for less."); *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119 ("[A] prudent man will pay no more for a given property than he would for a similar property."), *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision).

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill*, 88 T.C. at 1229 n.24). "[T]he market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe*, 34 T.C.M. (CCH) at 119). "This general rule applies with no less force when the unimproved property sought to be valued has potential for mineral extraction." *Ranch Springs*, 164 T.C., slip op. at 48–49 (first citing *J L Mins.*, T.C. Memo. 2024-93, at *58; then citing *Excelsior Aggregates*, T.C. Memo. 2024-60, at *38; and then citing *Savannah Shoals*, T.C. Memo. 2024-35, at *35); *see also Beaverdam*, T.C. Memo. 2025-53, at *62–63.

a.    *Proposed Comparable Sales*

On petitioner's side, Mr. Fletcher concluded that the comparable sales approach could not be applied because he did not think comparable property transactions existed. Mr. Proctor, on the other hand, was not even asked to look for comparable properties as he "was asked to assume that the Property would be used for the extraction and sale of dimension stone granite and to value the dimension stone granite that could be extracted and sold from the Property." Ex. 401-P, p. 14.

On the Commissioner's side, Mr. Sheppard did rely on the comparable sales approach. To identify comparable property sales, he began with a broad net that captured large numbers of sales beginning in the year 2000. He then narrowed his set significantly, including by seeking out transactions involving a party with a name related to mining or minerals and by using Google Earth to identify transactions regarding properties that held abandoned or active quarries.

By the end of this process, Mr. Sheppard had identified 52 sales of properties from 2000 forward that included any acreage and zoning with a mineral-named party as part of the sale or an existing pit on the property. He focused on properties that were as close to 200 acres as possible and industrial zoned. Using these and other criteria, Mr. Sheppard whittled down the 52 properties to the 4 comparables

71

[*71] listed in his Report. Information regarding each "before" comparable is as follows:

- Sale 1: This was a fee simple arm's-length sale of 227.19 acres in Elbert County. The property was about two miles north of Elberton, east of Anderson Highway. It was zoned industrial and contained a small, flooded, pit quarry near the road which was later drained. The property sold on December 19, 2018, for $1 million, or $4,402 per acre.

- Sale 2: This was the sale of the Sterling Gray Quarry to Mr. Adams. It involved a 205.473-acre property in Elbert County, at the northwest corner of Jones Ferry Road and Cedar Creek Road.[40] It was zoned industrial and was subject to a powerline easement. As we have already discussed, the property was mined for many years, but the quarry ultimately was abandoned around the time of the Great Recession in 2008. The property was sold by Republic Granite Company, the McLanahans' company, to Sterling Gray Quarries, LLC, Mr. Adams's company. It sold for $1,292,367,[41] or $6,290 per acre. The sale originated in the option agreement Mr. Adams entered into with the McLanahans in 2014. Mr. Adams exercised the option in 2019, and the sale was completed on May 6, 2019.

- Sale 3: Mr. Sheppard's third comparable was initially identified as two parcels in Oglethorpe County that totaled 112.42 acres of land. Mr. Kenny, petitioner's rebuttal expert, demonstrated that in fact only one parcel, of 76.27 acres, was sold in the transaction.[42] The parcel contained an on-site pit quarry and was

[40] Recall that, as part of a single transaction, Mr. Adams bought from the McLanahans the approximately 159-acre Sterling Gray Quarry, plus an additional 46-acre parcel adjacent to the quarry, for a total of approximately 205 acres.

[41] As we have discussed, $120,000 of the purchase price was allocated to the 46-acre property ($2,609 per acre), while the remaining $1,172,367 was allocated to the 159-acre Sterling Gray Quarry ($7,373 per acre). The price for the Sterling Gray Quarry was based on the $1.4 million option price initially agreed to by Mr. Adams and the McLanahans, less the royalties paid from 2014 through the time the option was exercised.

[42] During trial, Mr. Sheppard agreed that Mr. Kenny was correct about the acreage of sale 3, but he did not change his overall conclusion regarding the value of the Paul-Adams property before the grant of the easement.

[*72] zoned for mining. It sold on May 3, 2019, for $450,000, or $5,900 per acre.

- Sale 4: This was a sale from Harmony Blue Granite Company (Harmony) to Veribest Granite Company (Veribest Granite) of a 157.71-acre property in Oglethorpe County. The property was zoned industrial and contained an existing pit on its easternmost tract. The property sold on October 9, 2019, for $750,000, or $4,756 per acre.

### b. *Analysis*

For the reasons described below, we conclude that Mr. Sheppard's reliance on the four proposed comparable sales was reasonable.

### i. *Sale 1*

The Sale 1 property resembles the Paul-Adams property in size and proximity to Elberton and by the presence of a flooded pit quarry on the property. According to Mr. Kenny, the owner of the property had opened the quarry for a while, but then shut it down a number of years before the sale. It was unclear at the time of sale whether the pit was viable to mine, although the seller thought it was. After the sale closed, the buyer undertook significant due diligence to understand what was on the property, including "a lot of drilling and testing." Tr. 2096. Following these efforts, he was able to split the property and sell the two pieces for $3.5 million total.[43] Subsequently, a second pit was opened on the property.

In multiple respects, these details are similar to our findings regarding the condition of the Paul-Adams property in 2017. Moreover, we find it credible that the sale occurred at arm's length and thus that the transaction represents a comparably desirable substitute to acquiring the Paul-Adams property in 2017. Thus, we accept Mr. Sheppard's Sale 1 as a comparable property sale for valuing the Paul-Adams property.

### ii. *Sale 2*

We also accept Sale 2, the sale of the Sterling Gray Quarry, plus an additional 46-acre parcel, to Mr. Adams. Of course, there is

---

[43] Of the total $3.5 million the seller realized, $2 million was attributable to 126.81 acres sold to Williams Stone in 2021.

**[\*73]** significant information about this sale in the record. And we find that any dissimilarities between the sale and a hypothetical sale of the Paul-Adams property result in a per-acre value generous to petitioner.

For one, unlike the Paul-Adams property, the Sterling Gray Quarry had decades of history as a successful operating quarry. The quarry pit was larger than the pit at the Paul-Adams property and would have provided a potential buyer with significantly more information about the property's potential than would have been available for the Paul-Adams property. Mr. Adams himself testified about the high walls at the Sterling Gray Quarry that showed the kind of stone one was likely to get from resuming operations there. In explaining why he pursued the Sterling Gray Quarry in 2014 instead of developing the Paul-Adams property to supply his needs, Mr. Adams said "we knew we could immediately start [at the Sterling Gray Quarry] and produce a large amount." Tr. 1133. He continued: "[W]e knew we were going to need some big, clear, granite blocks, and we knew that [the Sterling Gray Quarry] had a lot of clear granite that was like die stock."[44] Tr. 1133. And finally, Mr. Adams explained that the Sterling Gray Quarry was a better option for the size of blocks he needed because "it was already opened up" and "[w]e had many walls exposed so we could get to it quickly." Tr. 1133–34.

Additionally, the president of the entity selling the Sterling Gray Quarry, John Jr., was the grandson and great-grandson of quarrymen. He was himself a sophisticated businessman successful in banking and with holdings in the granite industry. Together with his father, he had arranged for quarrying at the Sterling Gray Quarry as recently as 2008. Thus, we are not persuaded by petitioner's argument that Sale 2 reflected a sort of fire sale, a mad rush by John Jr. to rid himself of an unwanted quarry the worth of which he did not understand.

The fact that an heir does not seek to continue in the granite industry, and instead attempts to sell inherited property, does not imply that he does not know the value of the inherited property or is willing to

---

[44] The Sterling Gray property also has pink granite that Mr. Adams has not yet quarried. Mr. Adams explained at trial that colored granite, including the pink granite on the Sterling Gray property, "brings a whole lot more than gray granite," speculating that when he was selling gray granite for $14 per cubic foot, he could have sold the pink granite for $30 per cubic foot. Tr. 1195.

**[\*74]** sell it for below its fair market value.[45] No credible evidence supports that those were the circumstances here. *See United States v. Certain Land in City of Fort Worth*, 414 F.2d 1029, 1031–32 (5th Cir. 1969).

Further supporting this view, the terms of Mr. Adams's 2014 lease of the Sterling Gray Quarry exhibit a sophistication that undermines the theory petitioner presented at trial, namely, that Mr. Adams merely accepted John Jr.'s generous and uninformed offer. For example, Mr. Adams did not agree to buy the property right away. Instead, he negotiated to reduce his risk even more by leasing the property initially, with an option to buy. Mr. Adams was therefore permitted to "try out" the Sterling Gray Quarry at a low minimum annual royalty rate of $36,000 before committing to any purchase. He was not required to purchase the property until he knew exactly what he was getting—high quality, die-grade stone, including mausoleum blocks. Additionally, the lease agreement gave Mr. Adams a right of first refusal with respect to John Jr.'s fabrication business—a term unlikely to have been made part of the agreement if Mr. Adams had not sought it. Moreover, the lease allowed Mr. Adams to use equipment that was already on the property and gave him the option to buy that equipment at specified prices.

Petitioner also argues that the performance of the Sterling Gray Quarry in later years shows that Sale 2 was priced at a steep discount. In particular, petitioner highlights the $1.3 million of net income (from total revenue of $2,976,632) that was earned from the Sterling Gray Quary in 2022.[46]

As we have discussed, however, Sterling Gray's income in 2022 is not representative of its performance in years before the significant market upswing in 2021.[47] Notably, petitioner did not put in the record information regarding the performance of the Sterling Gray Quarry between 2014 and 2017—information that would have been in his possession. *See Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C.

---

[45] Note that, here, the Sterling Gray Quarry was owned by a company, not an individual, so it was not technically an heir's property.

[46] We note that the financial data uses the term "total income" rather than revenue.

[47] Of the five years of financial data we have for the Sterling Gray Quarry, 2022 was the high-water mark for net income. Even the later year, 2023, was lower, with net income of $1,225,579 and revenue of $3,321,007.

**[\*75]** 1158, 1165 (1946) (holding that the failure of a party to introduce evidence within his possession which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable), *aff'd*, 162 F.2d 513 (10th Cir. 1947). Instead, the Court has data only for 2019 to 2023. That data, however, suffices to prove the point.

In 2019, for example, five years after Mr. Adams began leasing the Sterling Gray Quarry and two years after the easement contribution date, the Sterling Gray Quarry had net income of $208,585 and total revenue of $908,752. In 2020, it had net income of $364,394 and total revenue of $1,147,453. Thus, between 2019 and 2022, the year petitioner understandably highlights, net income increased by more than 600%, while revenue more than doubled. And we can only surmise that the difference between 2022 and 2017, the year of the easement contribution, would be even starker.

To illustrate the significance of the lower revenue and net income amounts in earlier years on a potential sale price, consider the Star Granite transaction. One method of valuing a business for sale is to take a multiple of its annual revenue. In 2018, Mr. Adams sold Star Granite for $41.2 million after earning revenue of $31.3 million for the 2017 year. Accordingly, the sale price for Star Granite reflects a single-year revenue multiple of 1.32 ($41.2 million / $31.3 million). Applying that same multiple to the 2019 revenue for the Sterling Gray Quarry— $908,751.86—yields a value of $1,199,552 ($908,751.86 × 1.32). And, of course, applying the same multiple to Sterling Gray's presumably lower revenue in 2017 would produce a lower amount.

Of course, we do not suggest here that mechanically applying the Star Granite multiple would suffice to value the Paul-Adams property (or even the Sterling Gray Quarry). One can think of potential issues with such an approach.[48] But an analysis based on multiples offers a potential sanity check regarding petitioner's contentions. And nothing under this analysis suggests that the sale price for Sale 2 was at a discount, let alone a steep one.[49]

---

[48] For example, a different multiple might be appropriate for fabrication businesses as opposed to quarry operations, the proper multiple might be based on profit or some measure other than revenue, and anticipated synergies or other factors in a particular deal might influence the purchase price.

[49] And recall that, but for the $120,000 attributable to the additional 46-acre parcel, the price for Sale 2 was set in 2014, when the Sterling Gray Quarry had no recent track record of revenue.

**[\*76]** Finally, petitioner argues that Sale 2 cannot establish a fair market value because the sale (at least the portion represented by the Sterling Gray Quarry) is the result of an option price. But the very first case petitioner cites as support in fact refutes his view. Specifically, petitioner quotes *United States v. Smith*, 355 F.2d 807, 811 (5th Cir. 1966), for the proposition that

> [e]vidence of the price paid for other comparable property must be confined to instances in which the transactions have been completed by an agreement between a seller and a buyer for the sale of the property for a stipulated price. [A] mere offer, unaccepted, to buy or sell is inadmissible to establish market value.

Petitioner should have read further. On the very next page, the opinion notes: "Options which have been exercised and have thus become binding contracts of sale are in quite a different category from unexercised options . . . . Such exercised options, when they result in a binding agreement between buyer and seller, do not differ, from a probative standpoint, from completed conveyances."[50] *Id.* at 812.

*Smith*, a pre-1981 Fifth Circuit decision, is binding authority in the Eleventh Circuit. *See Bonner*, 661 F.2d at 1209. And, here, Mr. Adams of course exercised his option and purchased the Sterling Gray Quarry. The other authorities petitioner cites similarly do not support his position.

In short, we view Sale 2 as a valid arm's-length comparable that, to the extent it diverges from the hypothetical sale of the Paul-Adams property, is generous to petitioner.

### iii. *Sale 3*

We accept Sale 3 as well, subject to the adjustments pointed out by Mr. Kenny. The 76.27-acre property underlying the sale contained a flooded pit quarry and was zoned to permit mining. As Mr. Sheppard

---

[50] If we were to consider the 159 acres that were subject to the option to have sold for the $1.4 million option price, the price per acre for that portion of the transaction would be approximately $8,805 (unadjusted for the time value of money). And the overall per-acre price would increase to $7,415 ($1.4 million for 159 acres + $120,000 for 46 acres = $1.52 million for 205 acres, or $7,415 per acre). The per-acre price Mr. Sheppard ultimately selected for the Paul-Adams property would remain within the range of prices indicated by his comparable property sales.

[*77] discussed in his Report, smaller, more efficient properties often command higher prices than larger properties, so the size discrepancy between the Sale 3 property and the Paul-Adams property does not disadvantage petitioner.

Petitioner has provided no compelling evidence that Sale 3 was not an arm's-length transaction, and we observe that the sale price was in line with other similar sales in the area. Although Mr. Kenny points out that the sale was "never listed on the open market," Ex. 404-P, p. 14, it occurred when a prospective purchaser approached the owning family directly. Such direct-approach sales, when conducted at arm's length, provide persuasive evidence of value. *Cf. 69.1 Acres of Land*, 942 F.2d at 293–94 (considering testimony by the president of the largest local sand-producing company of the company's interest in acquiring the property at issue to hold for sand reserves and discussing other sales to sand producers); *Certain Land in City of Fort Worth*, 414 F.2d at 1032 (referring to sales "by private negotiation" (quoting *D.C. Redev. Land Agency v. 61 Parcels of Land*, 235 F.2d 864, 866 (D.C. Cir. 1956))); *Whitehurst*, 337 F.2d at 768, 775 (taking into account land that was purchased and then immediately resold).

iv.　*Sale 4*

At trial, Mr. Kenny maintained that Sale 4 was a capital contribution to Veribest Granite rather than an arm's-length sale. In many valuation cases, capital contributions to partnerships and other passthrough entities may not be suitable for use as comparable property transactions because they do not truly occur at arm's length. Here, however, the record reflects that the capital contribution to Veribest Granite was one step in a transaction designed to transfer the underlying property to new hands.

Before Sale 4 took place, Harmony owned the underlying property along Veribest Road in Madison County, Georgia. On October 9, 2019, Harmony contributed the underlying property to Veribest Granite. After the contribution, Harmony held a 99% interest in Veribest Granite. Shortly thereafter, Harmony sold a 97% interest in Veribest Granite to Veribest Acquisitions in exchange for $750,000, retaining a 2% interest. The transaction was recorded with Oglethorpe County as a sale of the property for $750,000.

The Court has had occasion to consider similar transactions implemented by combining a capital contribution with a sale of nearly

[*78] the entire interest resulting from the contribution. One such transaction occurred in *Seabrook Property, LLC v. Commissioner*, T.C. Memo. 2025-6. In *Seabrook*, the original owner of land in Liberty County, Georgia, sold for $4.74 million a 97% interest in a limited liability company that held her contributed land just days before the limited liability company contributed an easement over that land. We considered the sale of the 97% interest in the property-holding entity as informative of the property's value. *See id.* at *75.

In Sale 4, as in *Seabrook*, the sale of a 97% interest in a property-holding entity, shortly after the property's contribution, reflects the value of the underlying property.[51] And the property underlying Sale 4 is similar to the Paul-Adams property, as both are zoned for industrial use and contain abandoned quarries. Thus, we accept Sale 4 in addition to Mr. Sheppard's other comparable property sales.[52]

### v. *Mr. Sheppard's Conclusion*

Mr. Sheppard's "before" comparable property sales occurred at prices of $4,402, $6,290, $5,900, and $4,756 per acre, respectively. Mr. Sheppard selected a per-acre value of the Paul-Adams property of $4,750, which falls comfortably within the range of prices achieved in the comparable property sales. That is so even after adjusting the per-acre price for Sale 3 upwards to reflect that it involved a property smaller than Mr. Sheppard initially believed. And, when examined at trial, Mr. Sheppard testified that his conclusion as to value would not be changed by such adjustments.

---

[51] Petitioner did not present any credible evidence that the property-holding entity owned other assets or liabilities that would have meaningfully affected the value. Given that petitioner's expert, Mr. Kenny, admitted he had previously appraised the property underlying sale 4 in connection with the easement contribution that shortly followed sale 4, any such information presumably would have been available to petitioner.

Additionally, as in *Seabrook*, "other factors, such as control and marketability discounts, also could result in a lower price paid for an interest in an LLC . . . than would be paid for a direct interest in the assets held by the LLC . . . . Neither party presented arguments regarding control and marketability discounts, however, and so they have forfeited those arguments." *Seabrook*, T.C. Memo. 2025-6, at *75 n.56.

[52] We further note that, even if we were to eliminate comparable Sale 4 from consideration, it would not change our overall conclusion.

[*79]                          vi.    *Petitioner's Arguments*

Petitioner attempts to undermine Mr. Sheppard's comparable sales analysis by arguing, primarily, that Mr. Sheppard analyzed sales that were not between "market participants," that he analyzed sales that occurred after Paul-Adams contributed its easement, that Mr. Sheppard failed to verify the terms of the sales he selected, and that Mr. Sheppard's comparable properties did not have the correct highest and best use because they were not active mines. We find these arguments unpersuasive.

a)    *"Market Participants" Argument*

First, petitioner argues that Mr. Sheppard chose sales that were not between "market participants" as defined in the Appraisal Institute's *The Appraisal of Real Estate.* Petitioner's view of that term as applied here appears to be essentially that comparable property sales can occur only when both buyer and seller are active and knowledgeable participants in the granite industry because other buyers and sellers of land in Elbert County and the neighboring counties essentially cannot be expected to know the value of their land. We reject petitioner's view, primarily for three reasons.

First, petitioner identifies no legal authority suggesting that comparable property transactions should be limited in the manner he describes. Certainly, cases speak to knowledgeable willing buyers and sellers who are not under compulsion to transact, among other things. *See, e.g.*, *Smith*, 355 F.2d at 809. But we are aware of no case that limits the universe of acceptable buyers and seller to those with particular expertise, activities, or acumen. Indeed, precedent suggests otherwise. *See, e.g.*, *Whitehurst*, 337 F.2d at 768, 775 (treating a sale as comparable even though the seller thought the buyer would use the property to build a residence rather than reselling it to be used as a borrow pit and even though the seller testified that had he known the expected use he might not have made the sale and "[he] wouldn't have sold it as fast, and [he] wouldn't have sold it for the money that [he] sold it for either").

Second, petitioner's argument is at odds with the same treatise he cites. Specifically, while *The Appraisal of Real Estate* does not set out a definition of fair market value, it does define "market value" as follows:

> The most probable price, as of a specified date, in cash, or
> in terms equivalent to cash, or in other precisely revealed

**[*80]** terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

Appraisal Institute, *The Appraisal of Real Estate* 48 (15th ed. 2020); Ex. 70-J, p. 61. Nothing in that definition suggests that the buyer and the seller need have any special résumés, only that they be acting reasonably, knowledgeably, and freely, in their own self-interest.

The definition of "market participant" from the treatise is more of the same. It reads as follows:

[B]uyers and sellers in the principal (or most advantageous) market for the asset or liability who are

1. Independent of the reporting entity (i.e., they are not related parties)

2. Knowledgeable, having a reasonable understanding about the asset or liability and the transaction based on all available information, including information that might be obtained through due diligence efforts that are usual and customary

3. Able to transact for the asset or liability

4. Willing to transact for the asset or liability (i.e., they are motivated but not forced or otherwise compelled to do so).

Appraisal Institute, *supra*, at 65. Examples of market participants for a real estate market, according to the treatise, include the following: buyers, sellers, lessors, lessees, lenders, borrowers, developers, builders, property managers, owners, investors, brokers, and attorneys. *Id.* at 150–51. The treatise explains: "Each market participant does not have to be in contact with every other participant. A person or firm is part of the market if that person or firm is in contact with another subset of market participants." *Id.*

Whether or not we agree with all these assertions, we see nothing in them that is at odds with the comparable property sales Mr. Sheppard selected. As contemplated by the treatise, owners, buyers, and sellers of land within the Elberton granite area, particularly parcels with

81

**[\*81]** granite outcroppings and open pits, are very much "part of the market" for such land.  Thus, petitioner's argument fails even under its own terms.

Third, and perhaps most fundamentally, petitioner's argument would in effect have us assume that "the parties to the other transactions relied upon by the Government's witness[] were all economic idiots and did not know the value of the materials in the lands." *Whitehurst*, 337 F.2d at 775.  Like the U.S. Court of Appeals for the Fourth Circuit in *Whitehurst*, we will not do so.  "The fact that the sales prices do not reflect enhancement because of existence of [granite] to an extent even approaching that claimed by [the taxpayer's witnesses] demonstrated that there was no such enhanced value in the market." *Id.*  Put another way, instead of representing a purported flaw in how Mr. Sheppard conducted his analysis or issues with the parties to the comparable property sales he identified, the results of Mr. Sheppard's search simply reveal the lack of merit in the value conclusion petitioner urges on us.  *See id.*; *see also Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at \*7 (stating that if the taxpayer's proposed "plan were a 'reasonable and probable use' of the Property, other [similar, nearby] properties' values would have reflected that reality in their sales prices" (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 987)); *id.* at \*8 ("The IRS's expert identified substitute properties that could have sustained similar development plans, and those properties sold for far less on the market.  So the other properties [the IRS's expert] identified suggest the [taxpayer's expert's] appraisal significantly inflated the Property's market value.").

Our reluctance to embrace the unduly stringent standard that petitioner advocates finds support in longstanding precedent.  In another case concerning the value of land containing minerals, the Supreme Court rejected an invitation to exclude opinion testimony because it was not based on the sale of the same or similar property.  *See Montana Ry.*, 137 U.S. at 352–54.  In reaching its conclusion, the Court remarked on what was common knowledge then and is common knowledge now: "farmers living in the vicinity of a farm whose value is in question" know its value and are competent to testify to it.  *Id.* at 354.  Absent extenuating circumstances not shown here, this is even truer for a person who owns the property and decides to sell it.  *See Whitehurst*, 337 F.2d at 775.

**[*82]**                               b)    *Timing of Sales*

Second, petitioner argues that each of Mr. Sheppard's sales should be rejected because they all occurred after Paul-Adams contributed its easement. Petitioner also renewed at trial a Motion that we strike Mr. Sheppard's report on this basis.[53] We disagree with the argument and hereby deny the renewed Motion.

In general, while, all else being equal, sales occurring within a reasonable time before the valuation date might be preferable, sales occurring within a reasonable time after the valuation date may be used so long as the relevant market conditions have not materially changed. The Eleventh Circuit has long followed this approach, as that court described in *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1044 (11th Cir. 1988), in the context of valuation following a government taking:

> In this circuit, the definitive case on post-taking sales as evidence of fair market value is the *320.0 Acres* decision. *U.S. v. 320.0 Acres of Land, Etc.*, 605 F.2d 762 (5th Cir. 1979). . . . Th[at] court approvingly cited language from an opinion on post-taking sales: "There is no absolute rule which precludes consideration of subsequent sales. The general rule is that evidence of 'similar sales in the vicinity made at or about the same time' is to be the basis for the valuation and evidence of all such sales should generally be admissible . . . including subsequent sales." *Id.* at 799 (quoting *United States v. 63.04 Acres of Land*, 245 F.2d 140, 144 (2d Cir. 1957)).

The Eleventh Circuit went on to say that, "[w]hile post-taking sales are not automatically appropriate evidence of comparable value, neither are they automatically inappropriate." *Id.* The court of appeals then reversed the trial court for barring testimony regarding one such sale.

We decline petitioner's invitation to repeat that trial court's error. Moreover, cases from our Court and others reflect the same approach. *See, e.g.*, *First Nat'l Bank of Kenosha*, 763 F.2d at 894 (collecting authorities and observing in an estate tax case that "courts have not been reluctant to admit evidence of actual sales prices received for

---

[53] We previously denied a Motion in Limine making the same argument. *See* Order, July 2, 2025 (Docket Index No. 108).

**[*83]** property after the date of death, so long as the sale occurred within a reasonable time after death and no intervening events drastically changed the value of the property"); *Rubber Rsch., Inc. v. Commissioner*, 422 F.2d 1402, 1406 (8th Cir. 1970) (considering, in an income tax case, "evidence of actual sales" of stock "shortly before and shortly after the pertinent valuation date"), *aff'g* T.C. Memo. 1969-24; *CTUW Georgia Ketteman Hollingsworth v. Commissioner*, 86 T.C. 91, 103–04 (1986) (finding that a postvaluation date comparable sale indicated what a prospective buyer was willing to pay for land with similar development potential and including that comparable in the determination of value); *Champions Retreat Golf Founders, LLC v. Commissioner*, T.C. Memo. 2022-106, at *38–40 (considering a postvaluation date sale of the subject property); *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 2010 WL 5395108, at *12 ("We find that the evidence of lot sales within a reasonable period after the date of valuation . . . tends to make a given estimate of the lot prices more or less likely; that is, such evidence is relevant."), *aff'd*, 493 F. App'x 944 (10th Cir. 2012); *Estate of Stanton v. Commissioner*, T.C. Memo. 1989-341 (relying on the subsequent sale of the subject property and two postvaluation date sales and making slight adjustments to compensate for appreciation since the valuation date); *Estate of Hillebrandt v. Commissioner*, T.C. Memo. 1986-560, 52 T.C.M. (CCH) 1059, 1067–68 (finding a sale that occurred nine months after the valuation date showed the market for large tracts and set a ceiling on value); *see also* John A. Bogdanski, *Federal Tax Valuation* ¶ 3.04[3][b], Westlaw FTV WGL ¶ 3.04 (database updated April 2025) ("In selecting comparable sales, experts and the courts use sales both before and after the valuation date, with a general rule that the closer they are to the valuation date, the better.") (collecting authorities).[54]

---

[54] The U.S. Court of Appeals for the Seventh Circuit's decision in *First National Bank of Kenosha*, 763 F.2d at 894, helpfully reconciles the seeming inconsistency between the rule we discuss in the text here and that discussed above in note 39 (precluding reliance on information unavailable to the willing buyer as of the valuation date):

> The rule against admission of subsequent events is, simply stated, a rule of relevance. In a valuation case, the question to be asked of any proffered evidence is whether the admission of the evidence would make more or less probable the proposition that the property had a certain fair market value on a given date . . . . Under this traditional definition of relevance, evidence of most subsequent events would be excluded. For instance, if the proposition advanced is that a farm had a fair market value of $800,000 on March 13, the fact that oil was

**[\*84]** In a recent case, the Fourth Circuit warned trial courts against incorrectly excluding expert opinion concerning comparable sales. *9.89 Acres of Land*, 127 F.4th at 445–46. The court observed that "questions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness' assessment, not its admissibility." *Id.* (quoting *Bresler v. Wilmington Tr.*, 855 F.3d 178, 195 (4th Cir. 2017)). As in that case, petitioner does not contend that "sales comparison was an inappropriate methodology, or that [Mr. Sheppard] was an unqualified appraiser." *Id.* at 446. Rather, as in that case, petitioner takes issue with the timing and comparability of the sales Mr. Sheppard selected. *See id.* at 440–41 (describing the relevant sales at issue and the timing of those sales). The Fourth Circuit further observed that it had

> repeatedly held (in unpublished cases) that *Daubert* challenges to the comparability of sales in a sales comparison analysis go to weight and not admissibility. *See E. Tenn. Nat. Gas Co. v. 7.74 Acres in Wythe Cnty.*, 228 F. App'x 323, 329 (4th Cir. 2007) (citation omitted) (holding that challenge to comparability of sales did not present a "true *Daubert* challenge" to methodology, so inclusion should be affirmed); *Columbia Gas Transmission, LLC v. 76 Acres, More or Less, in Balt. & Harford Cntys.*, 701 F. App'x 221, 229–30 (4th Cir. 2017) (citing *7.74 Acres in Wythe Cnty.*, 228 F. App'x at 329) (same).

*Id.* at 446 (footnote addressing non-arm's-length and forced sales omitted).

We reach the same conclusion here. *See 320.0 Acres of Land*, 605 F.2d at 810 ("[T]he extent to which dissimilarities [in the comparable

---

unexpectedly discovered on June 13 (causing the fair market value of the property to skyrocket) makes the proposition advanced no more or less likely. However, the fact that someone under no compulsion to buy and with knowledge of the relevant facts bought the property on June 13 for $1,000,000 is relevant, for it makes the proposition advanced (i.e., that the fair market value on March 13 was $800,000) less likely.

Likewise here. The subsequent sales Mr. Sheppard identified, which took place when no material intervening events had occurred to change the value of properties in and around Elberton, make his opinion of the value of the Paul-Adams property as of December 2017 more likely and the opinions of value proffered by petitioner's experts less likely.

**[\*85]** properties] are reflected in market value is a question of the evidentiary weight of the comparable sales, which is a question for the [trier of fact].”); *see also Certain Land in City of Fort Worth*, 414 F.2d at 1032 (noting that, other than in a few specific instances not relevant here, “[t]here need be no showing of the non-existence of, or the nature of, the varied and variable economic reasons or motivations which might have moved the parties concerned [in a sale] to resort to the open market to dispose of property or to sell by private negotiation. Such considerations or pressures go to weight and not to admissibility, and may be developed, if desired, on cross examination or by independent evidence.” (quoting *61 Parcels of Land*, 235 F.2d at 866)).

Mr. Sheppard duly determined that the market had not materially changed between the date the easement was contributed and the dates of his proposed comparable property sales. We agree with his finding based on our review of the entire record in this case. Additionally, we note that Mr. Sheppard chose his four comparable property sales from longer lists of potential transactions, including 52 mineral-named land sales between 2000 and 2025. Of these 52 sales, 27 involved properties that were industrial zoned. And all but one of those had evidence of an existing mining pit or was adjacent to an existing pit. Except for a small number of outliers that Mr. Sheppard discussed, these sales, many of which occurred before the valuation date, confirm the reasonableness of Mr. Sheppard’s proposed comparable property sales and range.[55]

Mr. Sheppard’s proposed range also comports with the price suggested by prior sales of the Paul-Adams property itself, which we discuss shortly. And we further pause to note that the terms of Sale 2 (involving the Sterling Gray Quarry) were largely set in 2014, before Paul-Adams granted the easement and, importantly, Mr. Adams was fully aware of the terms of that arrangement. Mr. Sheppard reasonably treated the sale as occurring when the property changed hands, in 2019. But the option and its price were set in 2014, when Mr. Adams negotiated his lease of the quarry.

---

[55] Petitioner’s challenge to Mr. Sheppard’s use of postsale comparables is interesting in light of petitioner’s simultaneous contention that the market for granite was strong, with unquenchable demand and rising prices, during the relevant years. One might expect such market conditions to increase prices for land with granite deposits over time, so that using later-in-time sales would be favorable to petitioner.

**[*86]**                                              c)      *Purported Failure to Verify*

Petitioner next argues that Mr. Sheppard did not properly verify the comparable "before" sales he relied upon because he did not call the individuals involved in those sales.  As a result, petitioner argues, the court cannot rely on Mr. Sheppard's comparable "before" sales.

Mr. Sheppard identified the sales included in his analysis by reviewing relevant county records.  Courts have upheld that type of verification.  *See, e.g.*, *United States v. 5139.5 Acres of Land*, 200 F.2d 659, 661–62 (4th Cir. 1952).

Moreover, Mr. Sheppard explained that he typically contacts parties to a transaction only when data related to the sale is out of step with other sales he is reviewing.  This is particularly true, Mr. Sheppard said, in this kind of mining case, because his experience has been that the people he calls are reluctant to talk because they do not want to be subpoenaed or to run afoul of their friends or colleagues in the industry.  For this case specifically, Mr. Sheppard noted that many of the people he would have contacted are involved in other easement transactions or else are relatives or friends of individuals with a direct financial interest in the transaction here.

Overall, we found Mr. Sheppard's Report to be thorough and well done.  It is notable that the information Mr. Kenny supplied based on his own conversations generally did not undermine Mr. Sheppard's comparability analysis.  In a few cases, in fact, the additional information served to underscore the comparability of the relevant sale.  Additionally, Mr. Sheppard's observations regarding the tightly knit Elberton granite community are consistent with what we perceived in listening to testimony during trial and in reviewing the testimony from *Beaverdam* that the parties introduced.

Accordingly, on the facts before us, we are unconvinced that the absence of phone calls to verify comparable property sales invalidates Mr. Sheppard's analysis, and we find Mr. Sheppard's approach reasonable.  *See, e.g.*, *5139.5 Acres of Land*, 200 F.2d at 661–62.

d)      *Highest and Best Use*

Finally, petitioner argues that Mr. Sheppard's sales are flawed because the underlying properties did not have the correct highest and best use.  In petitioner's view, that highest and best use is as a working granite dimension stone quarry.  As we have explained at length,

**[*87]** however, a working quarry was not the highest and best use of the Paul-Adams property at the time the easement was contributed. *See supra* Opinion Part III.B.2.

Additionally, even assuming, for the sake of argument only, that petitioner is correct regarding the highest and best use of the Paul-Adams property, the comparable properties Mr. Sheppard selected were no less suited for that use than the Paul-Adams property. The property that was the subject of Sale 1, for example, went on to be sold to a mining company after it underwent further mineral testing. And the subsequent sales of portions of that property were for a combined price far lower than the one petitioner asks us to adopt. The Sterling Gray Quarry was quarried shortly after Mr. Adams began leasing it. And there is no credible evidence in the record that the abandoned pits on the properties that were the subjects of Sales 3 and 4 were any less suited for reopening than the abandoned pit on the Paul-Adams property, which had not been quarried for about five years. Thus, the four comparable properties Mr. Sheppard identified had the same highest and best use as the Paul-Adams property.

Or, put another way, even if mining were the highest and best use of the Paul-Adams property, the fact remains that the property was not a working mine as of 2017. Therefore, it was not comparable to a working granite mine. Instead, it was comparable to other properties with similar potential to be developed into working granite mines. And those are the types of comparable properties Mr. Sheppard chose.

Taking a step back, petitioner asks us to hold Mr. Sheppard's analysis to impossible standards, essentially arguing that any comparable property sale other than one involving a virtually identical property about which specific categories of buyers and sellers had perfect information must be disregarded as unreliable. Having so eliminated from consideration the universe of potential comparable properties, petitioner argues we have no choice but to rely on the owner-operator model (or, as a fallback, the royalty method). Petitioner seems untroubled that, as we discuss above and below, the discounted cashflow analyses his experts offered are rife with unjustified assumptions, guesstimates, and outright errors involving projections far out into the future. Having heard all the testimony and carefully reviewed the record in this case, we have no trouble concluding that Mr. Sheppard's approach—which is firmly grounded in actual comparable transactions—is far more reliable than that offered by any of petitioner's experts.

**[*88]**                              vii.    *The Court's Conclusion as to "Before"*
                                              *Comparable Property Sales*

Considering the record as a whole, including the testimony developed at trial, and having examined closely the method and analysis employed by Mr. Sheppard, we are persuaded to accept his conclusion as to the value of the Paul-Adams property before the easement contribution under the comparable sales method. Having completed our analysis under the comparable sales approach, we turn next to prior purchases and sales of the Paul-Adams property.

3.    *Actual Transactions Approach*

Sales and purchases of the Paul-Adams property before it was encumbered by the easement at issue also provide confirming points for the property's fair market value. Mr. Paul first acquired the property in 1997 for $199,000. Three years later, he sold it for $327,000. And seven years after that, in 2007, Mr. Paul and an entity owned by Mr. Adams bought the property back for $429,875.

This is not a case in which sales occurred so close in time to the grant of an easement that they reveal the value, just before the grant, of the unencumbered property. The transactions here occurred at least ten years before Paul-Adams contributed its easement in 2017. Nevertheless, analysis based on their values demonstrates consistency with the Commissioner's "before" valuation for the property.

To illustrate, consider the 1997 and 2007 transactions. Ten years apart, the transactions reflect a 116% increase in the property's value. That increase is equivalent to annual growth of roughly 8% compounded over ten years. Assuming that the property would continue to increase in value at approximately 8% annually, one would expect that by 2017 it would be worth $928,606. *Cf. Stanley Works*, 87 T.C. at 393, 405–06, 412–13 (determining the value of an easement granted in 1977 in part by starting with the estimated cost of acquiring the property in 1963 and increasing that cost to 1977 "using a land inflation factor of 3.6 percent, reflecting the general rise in the price of farm property in Connecticut between 1963 and 1977"). Such a result largely agrees with the Commissioner's valuation. Moreover, it is removed by an order of magnitude from petitioner's suggested value.

Annual growth of 8% may be generous to petitioner. In his discussion of real estate market conditions over the period of his survey, Mr. Sheppard noted that prices for vacant land in Elbert County fell

[*89] between 2007 and 2017, from $2,999 per acre to $2,156 per acre. And although the decline was not smooth in reality, it was equivalent over the decade to a 3.246% annual decrease. At that rate of decline, one would expect the property to have been worth only $309,040 by 2017.[56]

This is not to say that the property was truly worth $309,040 or $928,606 in 2017. The years between 2007 and 2017 saw complicated dynamics in local and national real estate markets that are not fully captured by a single compounding growth rate.

But this analysis, coupled with the record developed at trial, tells a compelling story about the inaccuracy of petitioner's "before" values. Even at an optimistic growth rate, the property's value comes nowhere near the valuation petitioner seeks. And petitioner has offered no credible evidence to support a drastic or sudden increase in value between 2007 and 2017.

Instead, the record reflects that, between 2007 and 2017, Mr. Adams and Mr. Paul experienced losses while using the Paul-Adams property, that Mr. Adams sought out a substitute for the Paul-Adams property by leasing the Sterling Gray Quarry, and that local property values declined. Even though this method does not, in this case, generate a precise "before" value, it provides a helpful indicator that petitioner's valuation is wholly inconsistent with market-based realities. Moreover, general agreement between the actual transaction method and the comparable sales method as applied by the Commissioner provides a useful "sanity check" for that method's result.

---

[56] The value suggested by this analysis is not extraordinary when one considers the representations Paul-Adams made in its 2017 Form 1065. Two Schedules K–1 were attached to the return. Each Schedule K–1 reported that the partner had made a capital contribution of $265,092, meaning that total contributions were $530,184. On each Schedule K–1, a box was checked indicating that the partner did not contribute property with built-in gain or loss. Schedule M–2, in turn, reported that the capital contributions of the partners came in the form of cash in the amount of $112,376 and property in the amount of $417,808. (Note that these two amounts add up to the combined $530,184 reported in the Schedules K–1, i.e., $265,092 + $265,092 = $112,376 + $417,808.) Putting all of this in plain English, the 2017 Form 1065 for Paul-Adams represented (1) that the partners had contributed property worth $417,808 to the partnership in 2017 and (2) that the fair market value of the property and its basis were the same (hence, no built-in gain or loss). The value Paul-Adams reported for the property—$417,808—is not that far off (in the context of amounts presented by the parties in this case) from the $309,040 suggested by the analysis in the text.

[*90] *See Ranch Springs*, 164 T.C., slip op. at 40; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *32.

### 4. *Income Approach*

"The income method determines [fair market value] by discounting to present value the expected future cashflows from the property." *Ranch Springs*, 164 T.C., slip op. at 54 (first citing *Chapman Glen Ltd.*, 140 T.C. at 327; and then citing *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision)). "The theory behind this approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income." *Id.* (citing *Trout Ranch, LLC v. Commissioner*, 2010 WL 5395108, at *4).

Mr. Fletcher, petitioner's expert, used this approach to determine the value of the Paul-Adams property. His analysis was premised on the assumption that the highest and best use of the property was as an active mine. As we have already explained, that assumption was mistaken. Because a foundational premise of Mr. Fletcher's analysis was mistaken, the resulting analysis and conclusion are also mistaken. Put most simply, Mr. Fletcher discounted the wrong cashflows over the wrong period. So his analysis tells us nothing useful about the value of the Paul-Adams property.

The same is true with respect to Mr. Proctor's analysis. Because his analysis assumes an active mine as the highest and best use of the Paul-Adams property, his discounted cashflow analysis similarly tells nothing useful about the value of the property.

Mr. Fletcher's and Mr. Proctor's discounted cashflow analyses suffer from additional flaws even if taken on their own terms (that is, even assuming simply for the sake of discussion—and contrary to our finding—that the highest and best use of the Paul-Adams property were an active mine).

As we recently explained, "[t]he income method is most reliable when used to determine the value of an existing business, with a track record of growth, income, expenses, and profits. A historical track record of this sort provides a plausible basis for projecting future revenue." *Ranch Springs*, 164 T.C., slip op. at 55.

Those are not the facts here. As of the date of easement, the Paul-Adams property had no existing business. It had no record of growth.

**[\*91]** It had no record of recent income, expenses, and profits. And the records it did have—tax returns from 2010, 2011, and 2012—showed significant losses. What's more, petitioner's experts neither asked for those records nor used them to inform their analyses.

In the absence of a "historical track record" that might provide "a plausible basis for projecting future revenue," *id.*, petitioner's experts essentially had to assume everything. But "[e]ach assumption, whether large or small, carries with it 'some risk of error.'" *Id.* (quoting *Whitehouse III*, 139 T.C. at 323). Moreover, "as interdependent assumptions multiply, the risk of error can increase exponentially: '[R]elatively minor changes in only a few of [an expert's] assumptions [can] have large bottom-line effects.'" *Id.*

"[T]he folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings" is well documented in our decisions and those of other courts. *See, e.g.*, *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision). "Lacking reliable data, the appraiser inevitably must rely on a lengthy series of assumptions, estimates, and guesstimates." *Ranch Springs*, 164 T.C., slip op. at 56.

Precedent from the Fifth Circuit, binding on the Eleventh Circuit, *see Bonner*, 661 F.2d at 1209, reflected on this problem some 70 years ago in an eminent domain case involving mining, *see Ga. Kaolin Co. v. United States*, 214 F.2d 284 (5th Cir. 1954). The question there was the fair market value of land whose highest and best use was kaolin mining. The landowner proposed that the value of the land should be determined by "estimating the amount of stone in situ and multiplying this amount by a fixed price per unit." *Id.* at 286. The district court rejected the proposal, and the Fifth Circuit affirmed. The court explained that the landowner's proposed methodology involved numerous assumptions: "[W]hether or not the deposits would be mined and [what] royalties [would be] paid would depend upon the condition of the market, the uncertainty of the future, the demand for the product, 'and many other elements, on and on, in the future.'" *Id.* (quoting the district court opinion). In short, the Fifth Circuit upheld rejection of the income approach "largely based on its speculativeness." *Id.*

The wisdom of the Fifth Circuit's reasoning is especially evident here. As we explained in our analysis of the highest and best use above, the assumptions reflected in petitioner's experts' discounted cashflow analyses are little more than guesswork. *See supra* Opinion

[*92] Part III.B.2.c.ii. Take for example the assumption of the quality of the deposits on the Paul-Adams property. Of the three borehole samples taken by Premier Drilling, only one had consistent color throughout. The second had inconsistent colors, as did the third, which went only to 35 feet.

Moreover, the borehole tells you only what you will encounter in the location drilled. As Mr. Adams himself candidly admitted, go five feet away in any direction, and you could run into a different stone. Dr. Schroeder echoed the same point when asked whether it could be that gneiss underlies the 30-foot borehole near the abandoned pit: "It could be, and it could not be. Both. No one knows." Tr. 528. Mr. Rutherford similarly observed that you do not know what type of stone you will get until you quarry it. Yet petitioner's experts assumed that quality granite would be found in abundance, that the hypothetical quarry would speedily capture market share, and, especially in the case of Mr. Fletcher, that the product would fetch pretty high prices.

"The speculativeness problem is obvious" when the appraiser needs to "estimate the cost of creating a [granite mining] business from scratch and to predict its future income, capital expenditures, and dozens of distinct cost items" for many years.[57] *Ranch Springs*, 164 T.C., slip op. at 56. Perhaps that is why the values derived by using this method appear to have no relationship to values observed in the market.

Experienced businesspeople in Elberton and elsewhere in this industry know inherently that there is much they do not know about any particular property. And they price their transactions accordingly. As we discussed above, Mr. Adams himself was given an option to pay only $1.4 million (and that in effect by installments) to acquire a quarry (the Sterling Gray Quarry) that produced quality granite for decades. Moreover, he would not need to exercise that option until after he had had a chance to use the property and find out whether it could produce the type of granite he was looking for. The cost for this flexibility was a mere $36,000 a year in minimum lease payments. Neither Mr. Adams nor Mr. Paul could come up with a single example where a quarry in Elberton or the surrounding area sold for anywhere close to $12 million (let alone the $25 million Mr. Adams mentioned in his testimony), the

---

[57] Of course, the Paul-Adams property did have a history of mining, a history that produced $362,315 of losses. But the financial results from that effort were not provided to petitioner's experts and did not inform their analyses.

**[\*93]** amount they ask us to believe the Paul-Adams property was worth before the easement was granted.

Mr. Rutherford testified that he merged his quarry operation with another business in 2020 and that he and his son received a little less than $7 million in consideration for the active quarry, its equipment, and its customer lists. In addition to being an active quarry with established revenues and customers (which the Paul-Adams property did not have in 2017), Mr. Rutherford's quarry produced 65% die stock, the highest grade of dimension stone after mausoleum stone. Nothing credible in the record indicates that the Paul-Adams property would produce that much quality stone. And even with all its advantages and the additional assets transferred in the transaction, and the later year of the sale, the consideration Mr. Rutherford and his son received did not exceed $7 million (significantly lower than the $12.2 million petitioner claims the inactive Paul-Adams property was worth in 2017).

That businesses, including businesses in the aggregates industry, use the discounted cashflow method to make decisions on how to allocate their capital does not change the fact that it is a poor fit here.

In this context, the teaching of the Fourth Circuit in a takings case seems particularly relevant. "[The] 'income capitalization' method of ascertaining just compensation [is] disfavored by federal courts." *69.1 Acres of Land*, 942 F.2d at 293 (footnote listing five circuit court cases omitted). This is so because

> [t]his method . . . takes a specified number of units of the mineral, multiplies it by projected prices into the future, then discounts the flow of income to a supposed present value. These valuations almost always achieve chimerical magnitude, because, in the mythical business world of income capitalization, nothing ever goes wrong. There is always a demand; prices always go up; no competing material displaces the market. As the seminal case on the subject stated, "[i]t would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation." *United States ex rel. TVA v. Indian Creek Marble Co.,* 40 F. Supp. 811, 822 (E.D. Tenn. 1941).

*Id.* at 293–94 (footnote noting that this type of "valuation" "cannot pass the giggle test" omitted).

[*94] In any event, regardless of whether it may or may not be appropriate to use the owner-operator method generally, the degree of speculation required for its application here makes that method unreliable in this case. *See, e.g.*, *Ranch Springs*, 164 T.C., slip op. at 56 (finding that the income approach would be inappropriate even if mining were the property's highest and best use); *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968) (rejecting a real estate valuation premised in part on the income approach in favor of a market value established by a recent sale of the property), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *J L Mins.*, T.C. Memo. 2024-93, at *56 (finding that the income approach would be inappropriate even if mining were the property's highest and best use); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *40 (same).

We also pause briefly to comment on the royalty valuation reflected in Mr. Proctor's report. Mr. Proctor does not rely on this valuation for his ultimate value conclusion, but he notes that "a valuation of a realistic royalty scenario is also economically accretive." Ex. 401-P, p. 60. Mr. Proctor sets out his assumptions for this conclusion as follows:

> If we were to value a royalty on the Paul-Adams property, we would do so using the percentage of sales arrangement with a rate of 10%, given that we have reviewed documents showing the validity of the agreement. We would also model a $52,000 minimum monthly payment, which is very similar to the terms on the royalty document we reviewed. Given all the same assumptions from the scenario evaluated, the [net present value] would equal $5,349,000.

Ex. 401-P, p. 58.

The "arrangement" Mr. Proctor relies on for this conclusion involves Mr. Paul. In 2023, Mr. Paul's family members sold their interests in a fabrication plant to Matthews. Shortly after that, Polycor agreed to lease three quarries owned and operated by Mr. Paul. The lease requires a royalty payment equal to 10% of sales. It also provides for a monthly minimum payment of $50,000, which translates into an annual minimum payment of $600,000. Mr. Paul testified that the year before the lease arrangement was entered into, Mr. Paul's quarries had about $6 million in sales. Based on that number, Mr. Paul asked for a monthly minimum of $50,000.

**[\*95]** The arrangement makes perfect sense. Mr. Paul was willing to lease his quarries to a third party, but he wanted assurance that he would receive a minimum royalty based on the sales his well-established business had already achieved.

What makes no sense, however, is to assume (as Mr. Proctor does) that an upstart could obtain the same terms in a royalty negotiation. Under Mr. Proctor's royalty analysis, an entity that had produced not a single cubic foot of granite for five years would convince a would-be lessee to agree to pay a minimum royalty of $624,000 per year for the privilege of using its property. Note that the minimum royalty Mr. Proctor contemplates Paul-Adams would receive is even greater in dollar terms than the minimum royalty Mr. Paul received. This is so, we understand, because the Paul-Adams property has more acreage than the quarries covered by Mr. Paul's lease.

Under Mr. Proctor's royalty valuation, the would-be lessee pays only the minimum royalty amount in every year the arrangement is in effect. This tells us that the production of the mine throughout the forecast period is always lower than the floor contemplated by the arrangement. How this could make any rational economic sense is not explained. Petitioner's own expert, Mr. Kenny, admitted that a calculation under which a minimum royalty payment was always present showed that the estimated production was overstated.

But the inclusion of the analysis in the Proctor Report is telling nevertheless. First, it tells us that even a grossly exaggerated royalty yields less than half the value for the Paul-Adams property than Mr. Proctor's owner-operator model produced. The royalty valuation indicated a value of approximately $5.3 million, while the owner-operator model yielded a value of $12.2 million.

The disparity in these values should have raised red flags for anyone looking for a reasonable determination of value here.[58] As implemented by petitioner's experts, the owner-operator approach captures all the returns relevant to running a mining operation and attributes most of them to the property itself. The royalty approach, by contrast, captures only the returns inherent in the property. And of course the task before us is to determine the returns inherent in the property, as the restriction imposed by the easement relates to the

---

[58] Done properly, the two methodologies should have each produced the same or at least similar values.

**[\*96]** specific real property.  I.R.C. § 170(f)(3)(A) ("In the case of a contribution . . . of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest had been transferred in trust."); *id.* subpara. (B) ("Subparagraph (A) shall not apply to . . . (iii) a qualified conservation contribution.").

Put another way, when donating an easement, property owners may give up the right to use a particular property for a particular purpose (e.g., mining).  But the easement in no way limits the property owner's right to conduct business elsewhere.  The property owner remains free to lease another similar piece of property and apply his existing capital, skills, and so on to mine there.  So long as the lease payment for the similar property is equal to what the lease payment would be for the property on which the easement will be granted, the owner would continue to receive all the returns to which the owner would be entitled for his mining activities, except for the value attributable to the land itself.

Second, the royalty analysis, like the owner-operator method, is sensitive to assumed values.  For example, removing the "minimum" payment obligation from the calculation, and requiring the would-be lessee to pay just a 10% royalty on the revenues Mr. Proctor projects, would drastically reduce the present value of a hypothetical royalty.  The result would be a far cry from both the $12.2 million and the $5.3 million shown in Mr. Proctor's Report.  And any royalty calculation relies on Mr. Proctor's rosy assumption that Paul-Adams would capture a large share of the market.  Moderate that assumption, or any of the other assumptions we have discussed with respect to sales, and the indicated value goes further down.

Third, the royalty analysis also suggests that Mr. Proctor's Report was geared to achieving the highest result possible for his side.  *See, e.g.*, *Zarlengo v. Commissioner*, T.C. Memo. 2014-161, at \*45 ("Experts lose their usefulness and credibility when they merely become advocates for the position argued by a party." (citing *Laureys v. Commissioner*, 92 T.C. 101, 129 (1989))).  Mr. Proctor's Report elliptically notes that some operators "were aware of royalty holders who had negotiated a units of production royalty, but could not confirm the dollar value per cubic foot." Ex. 401-P, p. 58.  The mysterious phrasing became clear at trial.

[*97] Mr. Adams himself had negotiated just that type of royalty in connection with the lease/purchase arrangement for the Sterling Gray Quarry in 2014. Under that arrangement, Mr. Adams would pay $1 per cubic foot for gray granite, except the rate dropped to 33 cents for curbing sales. And the arrangement contemplated a $36,000 annual minimum payment. Why Mr. Proctor was not given access to the document is not clear, although, to his credit, Mr. Proctor agreed on the stand that it would have informed his royalty analysis if it had been available.

Of course it would have. The lease for the Sterling Gray Quarry is far closer (although still superior) to the circumstances Paul-Adams faced in 2017 than Mr. Paul's arrangement from 2023. When Mr. Adams agreed to the terms of the lease, the Sterling Gray Quarry had not been in production for some seven or eight years, so (unlike Mr. Paul's active quarries) it had no immediate revenues. And, in those circumstances, the minimum payment was a mere $36,000 per year.

Let us also look beyond the minimum payment for a moment. If one were to apply the "units of production" royalty amounts that Mr. Adams negotiated (33 cents for each cubic foot of curbing granite sold and $1 per cubic foot for everything else) to Mr. Proctor's projections about sales and product mix, the net present value of the stream of royalties that would be due to Paul-Adams would be less than 40% of the royalty value determined by Mr. Proctor. This is an even further cry from the values reflected in Mr. Proctor's Report. And as before, if Mr. Proctor's rosy sales assumptions are moderated (for example by assuming that Paul-Adams does not capture as much market share as Mr. Proctor projects), the value goes down further.

We note additionally that the Sterling Gray Quarry had a far better historical pedigree than the Paul-Adams property. The Sterling Gray Quarry had been in operation for more than 80 years before its closing, and for decades operated successfully. Mr. Adams testified, for example, that he knew he wanted to buy the Sterling Gray Quarry "really the day [John Jr.] offered it," that he also knew the Sterling Gray Quarry "had a lot of clear granite that was like die stock," and that the quarry "was already opened up" and "had many walls exposed so we could get to [mausoleum-sized blocks] quickly." Tr. 1132–34. The Paul-Adams property, by contrast, had a small pit that was in operation at a loss for a mere two years (three if one counts 2010). Thus, there is no credible evidence in the record suggesting that the Paul-Adams property should command a higher royalty than Sterling Gray.

**[\*98]** We also note that the arrangement for the Sterling Gray Quarry in a way put a cap on potential royalties by providing an option that would transfer the property to Mr. Adams in exchange for a payment of $1.4 million less already-paid royalties. (We say "in a way" because it was at least possible for the option not to be exercised.) So, a lessee who found the Paul-Adams property productive in the first five years would be incentivized to limit his royalty payments and simply exercise the option.

We offer this analysis not as proof of what the value of the Paul-Adams property would actually be under a capitalized royalty income method (a disfavored method as we noted above), but simply to show that more realistic assumptions based on market arrangements would yield values far closer to those reflected by the comparable sales approach than the results dreamed up by petitioner's experts under the owner-operator version of the income approach.

### 5. *Petitioner's Hybrid Method*

In a last-ditch effort to moderate his untenable position, petitioner proposed in his closing argument a hybrid method for valuing the Paul-Adams property. Under petitioner's newly proposed method, the property would be valued in two parts. First, 30 acres of the property would be designated as quarry property and valued using a royalty method. Second, the remaining 177 acres would be valued using the comparable sales method with a per-acre price. For several reasons, petitioner's proposal does not persuade us.

### a. *The Proposed Royalty Method*

For the 30 acres valued under the royalty method, petitioner proposed that the property would command either a $3,000 per month minimum royalty or a $25,000 per month minimum royalty. (Recall that $3,000 per month is the minimum royalty that Mr. Adams had agreed to pay the McLanahans for leasing the Sterling Gray Quarry.) On top of this minimum, petitioner proposed a royalty of 10% of sales. In performing his computations, petitioner used a 5% discount rate and the same projected sales that Mr. Proctor assumed in preparing his discounted cashflow analysis. Virtually all aspects of this proposal lack merit.

First, by relying on Mr. Proctor's projected sales, petitioner has imported into his royalty proposal the same problems we have already noted with respect to the owner-operator analysis discussed earlier. As

**[\*99]** we have already explained, we find Mr. Proctor's conclusions regarding production volume, efficiency, demand, and pricing unrealistic in the extreme. Each of those inputs affects the projected sales. Incorporating them again here is fatal to petitioner's proposed royalty method.

Second, even if we ignore the projected sales and focus instead on the minimum royalty, petitioner's proposal fares no better. Specifically, petitioner selected the $3,000 per month minimum royalty by looking to the Sterling Gray Quarry transaction as a model. (The annual minimum lease payment of $36,000 with respect to the Sterling Gray Quarry reflects a $3,000 per month minimum lease payment—$36,000 / 12 = $3,000.) We agree that the Sterling Gray Quarry arrangement is a good example of a market transaction. But, in the Sterling Gray Quarry transaction, the $3,000 per month minimum was paid to lease the entire 159-acre property, not just the portion that was being used to quarry. So, petitioner's attempt to apply the royalty to just 30 acres of the Paul-Adams property compares apples to oranges.

Furthermore, if we were to apply the Sterling Gray royalty to the entire Paul-Adams property, the result would support the Commissioner's valuation. Recall that the Paul-Adams property consists of 207.32 acres and so is larger than the Sterling Gray property. If we were to adjust the minimum royalty up to account for the greater acreage, comparing apples to apples and drawing assumptions in petitioner's favor, we would get a royalty rate of approximately $3,912 per month.[59] Using the same (unduly generous to petitioner) 5% discount rate used by petitioner and assuming that the minimum royalty rate was paid every month during the term, a $3,912 per month royalty would suggest a net present value for the Paul-Adams property of approximately $938,880. This is less than the amount Mr. Sheppard concluded and nowhere close to the amounts petitioner has claimed.

Regarding the proposed $25,000 per month minimum royalty, we simply do not believe that anyone would pay this amount—more than eight times the amount that Mr. Adams had paid to lease a much more proven quarry—to lease the Paul-Adams property. The Sterling Gray Quarry transaction establishes a ceiling in this regard, and a high one

---

[59] The computations are as follows: $3,000 per month / 159 acres = $18.87 per acre per month for the Sterling Gray Quarry. $18.87 per acre per month for the Sterling Gray Quarry × 207.32 acres of the Paul-Adams property = $3,912 per month for the Paul-Adams property.

[*100] at that.  It certainly does not establish a floor, as petitioner would appear to contend.[60]

b.  *The Proposed Comparable Sales Method*

For the remaining 177 acres of property, petitioner proposed three different per-acre values that he contends represent the value of nonquarry industrial properties in Elbert County.  First, he proposed $6,493 per acre, based on the average price Mr. Sheppard identified for industrial-zoned properties in the area purchased or sold by a mineral-named entity, many with a small pit.  Second, he proposed $8,934 per acre, based on a single 42-acre sale identified in Mr. Sheppard's report.  Third, he proposed $14,985 per acre, based on a weighted average of sales of *small* industrial properties (between 0.4 acres and 30.08 acres) in the area between 2015 and 2018, which were not vacant land.  Nearly all of the sales involved very small properties (fewer than 5 acres) and many of them were within the city of Elberton.  Given their coding by the Elbert County Tax Assessors Office, we assume they contained

---

[60] During closing statements, petitioner also pointed to a 2014 transaction involving Mr. Rutherford.  In 2014, Mr. Rutherford expanded existing operations by buying 6.5 acres from Sweet City Granite for $700,000, or $107,692 per acre.  The 6.5 acres included an active quarry that was adjacent to Mr. Rutherford's existing quarry.  The record does not provide precise details about the nature of the transaction or the property at issue.  But the sale was of an active quarry and so is not comparable to a hypothetical sale of the Paul-Adams property.  Moreover, the record does not indicate whether equipment or other assets were included in the sale, or what synergies might have existed from the quarry's location next door to Mr. Rutherford's existing operation.  And, even if we assume (just for the sake of argument) that this per-acre price could be applied here, we believe it would be limited to the area of the Paul-Adams property proposed to be used as a dimension stone quarry (not to the area proposed as an aggregate quarry, as petitioner has disclaimed reliance on that type of quarrying).  Petitioner's experts contemplated in their analyses a 4-acre dimension stone quarry.  Valued at $107,692 per acre, those 4 acres would be worth $430,768.  And valuing the remaining 203.32 acres of the Paul-Adams property (207.32 acres − 4 acres = 203.32 acres) at the average per-acre sale price for Elbert County in 2017 ($2,156 per acre) would yield a value of approximately $438,358.  The combined result of $869,126 is lower than the value proposed by Mr. Sheppard and significantly lower than the values that petitioner advocates.

We use the average per-acre sale price in Elberton County for this analysis, rather than the average for industrial properties, because the extremely high per-acre price for the 4-acre mine captures the value of the property's zoning for industrial use (i.e., mining).  Moreover, even if we were to double the price per acre for the remaining 203.32 acres, the resulting value would be far closer to Mr. Sheppard's proposal than to petitioner's.  We further note that adjusting the 2014 amount to account for the time difference between 2014 and 2017 would not make a meaningful difference to this analysis.

**[\*101]** improvements. *See* Ex. 102-P, p. 1 (containing columns for "Year Built" and "Square Ft," indicating improvement).

Taking petitioner's proposals in reverse order, petitioner does not explain why industrial properties up to 500 times smaller than the Paul-Adams property, some of which are located within the city of Elberton and nearly all of which appear to have had one or more structures (some quite large) built on them, would offer a reliable point of comparison here. Presumably petitioner liked the higher prices commanded by such properties, but that is not enough to make them comparable.[61]

The same analysis applies to petitioner's $8,934 per acre proposal. Again, the property was small (42.2 acres), and it was not in Elbert County. Mr. Sheppard explained that smaller properties typically commanded higher prices per acre and did not select it as one of his comparable properties. We see the attraction of the higher price point for petitioner, but do not see any reason why we should select this single comparable for the Paul-Adams property.

Petitioner's $6,493 per acre proposal is less outlandish, being based on industrial-zoned properties in the area, almost all with small pits, bought and sold by mineral-named entities. But, given the potential comparability of these properties to the whole of the Paul-Adams property, including the abandoned quarry, it would make little sense to use this value for the *nonquarry* 177-acre parcel petitioner proposes. If instead we were to use the $6,493 per acre proposal to value the entire Paul-Adams property, we would get a value of $1,346,148. This amount is much closer to the amount determined by Mr. Sheppard than any of the various amounts proposed by petitioner. And, importantly, we accept Mr. Sheppard's reasons for narrowing the pool further, resulting in a smaller set of comparable properties and a lower range of prices.[62]

---

[61] Recall that the only structures on the Paul-Adams property were two small residences, both built more than 55 years before the easement donation date, and collectively valued at $33,218 by the Elbert County Property Assessor. There also was a prefab shed. Petitioner provided no information about the value of the structures that existed on his proposed comparable properties.

[62] For example, the comparable sales data set that produced the $6,493 per acre average included several outliers identified by Mr. Sheppard that commanded prices significantly above those commanded by the other properties in the set. Additionally, more than half of the properties included in the set were significantly

**[\*102]** D.  *Valuation of the Paul-Adams Property After the Easement Was Granted*

Mr. Sheppard and Mr. Fletcher both used the comparable sales method to value the Paul-Adams property after the easement was granted.  Mr. Sheppard selected three comparables with an adjusted range between $1,689 and $2,120 per acre.  Based on those comparables, he determined an "after" value of $373,000, or approximately $1,800 per acre.

Mr. Fletcher also selected three comparables.  He did not make adjustments, and his comparables had an unadjusted range between $875 and $2,500 per acre.  Based on those comparables, Mr. Fletcher determined an "after" value of $310,980, or approximately $1,500 per acre.

Mr. Fletcher's analysis contained several inconsistencies.  For example, his summary stated that he had selected four comparable sales, all sold in 2013 and ranging in size from 209 acres to 829 acres.  But his analysis discussed only three.  One sale was from 2006 and two were from 2013, and the properties sold ranged from about 157 acres to about 385 acres.  Additionally, the underlying property Mr. Fletcher viewed as most similar to the Paul-Adams property related to the 2006 sale.  He did not discuss the 11-year gap between that sale and the easement transaction or make any adjustments to account for it.  This despite stating earlier that he had eliminated all pre-2013 sales.  We therefore find Mr. Sheppard's analysis more reliable and adopt his conclusion regarding the value of the Paul-Adams property after the easement was granted.

E.  *Valuation Conclusion*

As discussed above, we have determined that the value of the Paul-Adams property before the easement was granted was $985,000, as proposed by Mr. Sheppard.  We have further determined that the value of the property after the easement was granted was $373,000, also as proposed by Mr. Sheppard.  We therefore agree with Mr. Sheppard that the value of the easement was $612,000.

---

smaller than the Paul-Adams property.  As Mr. Sheppard explained, smaller properties tend to command higher prices per acre because they are more efficient; i.e., they include less land that is unnecessary for the industrial purpose (here, quarrying for dimension stone).

**[*103]** IV.    *Penalties*

A.    *General Principles and Application*

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." I.R.C. § 6662(a), (b)(3); *United States v. Woods*, 571 U.S. 31, 43 (2013) ("Taxpayers who underpay their taxes due to a 'valuation misstatement' may incur an accuracy-related penalty."). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." I.R.C. § 6662(h). A misstatement is "gross" if the value of property claimed on the return is 200% or more of the correct amount. I.R.C. § 6662(h)(2)(A)(i); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369.

We have determined that the correct value of the easement on December 22, 2017, was $612,000. Double that amount is $1,224,000. The value Paul-Adams claimed for the easement on its return ($10,234,108) was far in excess of $1,224,000. The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." I.R.C. § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* I.R.C. § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* I.R.C. § 6664(c)(3) (first sentence); *see also Chandler v. Commissioner*, 142 T.C. 279, 293 (2014) ("The [Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780] . . . eliminated the reasonable cause exception for gross valuation misstatements of charitable contribution property."). The 40% penalty thus applies to the portion of the underpayment attributable to claiming a value for the easement in excess of $612,000. *See Seabrook*, T.C. Memo. 2025-6, at *76–77; *Jackson Crossroads*, T.C. Memo. 2024-111, at *48; *Oconee Landing*, T.C. Memo. 2024-25, at *75.

The Commissioner alternatively seeks a 20% penalty for (among other things) a substantial understatement of income tax. *See* I.R.C. § 6662(a), (b)(2). This penalty would apply to what might be called any "lower tranche" of the underpayment, i.e., the portion of any

[*104] underpayment that was not attributable to a valuation misstatement. *See Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, at *2. Because we hold Paul-Adams is entitled to a deduction for the correct value of the conservation easement donation, there is no underpayment not attributable to a valuation misstatement, and we need not address the alternative penalties.

"The maximum accuracy-related penalty imposed on a portion of an underpayment may not exceed 20 percent . . . (40 percent of the portion attributable to a gross valuation misstatement), notwithstanding that such portion is attributable to more than one of the types of misconduct described in paragraph (a) of this section." Treas. Reg. § 1.6662-2(c). The Court has jurisdiction to readjust partnership items and the applicability of any penalty that relates to an adjustment to a partnership item. I.R.C. §§ 6221, 6226; *Woods*, 571 U.S. at 39–42. Although nothing limits our ability to determine the applicability of more than one accuracy-related penalty at the partnership level, *Oconee Landing*, T.C. Memo. 2024-73, at *3–4, we need not do so here, *see Seabrook*, T.C. Memo. 2025-6, at *77 n.60.

B.    *Constitutional Challenge*

Petitioner contends that the gross valuation misstatement penalty should not be applied here, in part because it is unconstitutionally vague. Specifically, petitioner argues that courts have been inconsistent in defining the term "value" as used in the statute and related regulations, *see* I.R.C. § 6662(e)(1)(A), (h); Treas. Reg. § 1.170A-1(c), rendering the standard void for vagueness. The claim has no merit.

The vagueness doctrine is grounded in the Due Process Clause of the Fifth Amendment. *See United States v. Williams*, 553 U.S. 285, 304 (2008); *Parks v. Commissioner*, 145 T.C. 278, 342 (2015), *aff'd*, 717 F. App'x 712 (9th Cir. 2017); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). It "requires the invalidation of laws that are impermissibly vague." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. "But 'perfect clarity and precise guidance have never been required . . . .'" *Id.* (quoting *Ward v. Rock Against*

**[\*105]** *Racism*, 491 U.S. 781, 794 (1989)); *see also Colon v. Commissioner*, T.C. Memo. 2018-113, at \*10–11.

Section 6662(h), the statute setting forth the gross valuation misstatement penalty, and the related statutory and regulatory provisions are not vague. A person of ordinary intelligence has fair notice of what is prohibited. The value of property claimed on that person's return must not be 200% or more of the correct amount. Nor has petitioner pointed to any rule in the related regulations that fails to provide fair notice of the conduct that the rules prohibit.

To the extent petitioner takes issue with how the courts have applied the rules in specific cases, his recourse is to argue that those cases were wrongly decided, as he has done here. But disagreement with outcomes of cases does not render the relevant standard unconstitutionally vague. *See Williams*, 553 U.S. at 306 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). Petitioner's argument therefore fails.

\*       \*       \*

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*